(No. 44620.—
THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. GEORGE ELLIS SIMMONS, Appellant.

*Opinion filed March 24, 1975.*

RYAN, J., and UNDERWOOD, C. J., dissenting.

David F. Smith, of Loves Park, for appellant.

William J. Scott, Attorney General, of Springfield, and Philip G. Reinhard, State's Attorney, of Rockford (James

B. Zagel, Jayne Carr, and Thomas Connors, Assistant Attorneys General, of Chicago, and Daniel Doyle, Assistant State's Attorney, of Rockford, of counsel), for the People.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, George Simmons, was found guilty by a jury in the circuit court of Winnebago County of two charges of murder and sentenced to two concurrent terms of 30 to 60 years in the penitentiary.

Defendant, 16 years of age, was one of several boys living on Rockford's west side, who over a period of approximately a week had engaged in a running dispute with some boys from Freeport, who were visiting in Rockford. On at least two occasions shots had been fired. On July 8, 1970, 11 to 16 shots were fired from a rooftop across the courtyard from an apartment in a public housing project where the Freeport boys were visiting, killing two of them.

Although it is undisputed that defendant fired the shots, the testimony of the defendant, and of the boys who were on the rooftop with him when the shots were fired, is to the effect that defendant did not intend to hurt the Freeport boys, but intended to frighten them by shooting over their heads or at their feet. Defendant's companions, who were not indicted, were called as witnesses by the People.

The only testimony that defendant intended to shoot the victims was that of the operator who had administered a polygraph examination to defendant. He testified that defendant had told him that he intended to shoot at the boys because "it was either them or me."

Defendant contends first that the circuit court erred in denying his motion to suppress the oral statement made to the polygraph operator and that in admitting the

statement into evidence the circuit court committed reversible error.

The evidence taken at the hearing on defendant's motion to suppress shows that at approximately 8 a.m. on July 27, 1970, two Winnebago County sheriff's detectives went to defendant's home. In the presence of defendant's mother, Detective Meyers told defendant that they wanted to question him concerning the killings, and defendant went with them to their car. En route to the sheriff's office, defendant was given *Miranda* warnings, and upon arrival at the sheriff's office was again advised of his rights. He signed a printed form headed "Voluntary Statement" which purported to acknowledge that he had been fully advised of his rights. He was questioned for four hours, during which time he denied any involvement in the shooting. At noon Captain Iasporro, of the sheriff's office, called defendant's mother on the telephone in order to verify a portion of defendant's story; defendant, aware of this telephone conversation, then changed his story, saying that on the night in question he had seen Mike Thomas with a gun near the scene of the shooting. At approximately 1:30 or 2 p.m. Detective Coots picked up defendant's mother at her place of employment and brought her to the sheriff's office. In her presence, defendant repeated his story concerning Mike Thomas. Defendant was then asked to take a polygraph examination, and both he and his mother signed a consent form. Defendant's mother had had a fifth grade education in Mississippi. A psychiatrist testified that defendant had an I.Q. of 80 on the Wechsler Adult Intelligence Scale, a score classified as "borderline, mentally retarded" and which placed him in the lowest 20 percentile of the population. Tests also revealed that his comprehension of social situations, ability to think abstractly, and general information were quite low.

At about 2:15 p.m., defendant was taken to the State's Attorney's office. After being again advised of his

rights he made a statement that was recorded by a court reporter, in which he denied involvement in the shooting. At 3 p.m. after agreeing to meet with the detectives at 6:30 the following morning to go to Chicago to take the polygraph examination, he was released. He and his mother were then driven home by Detective Meyers. The next morning Meyers and Coots waited for defendant from 6:10 until 8 a.m., but he did not appear.

Approximately a year earlier defendant had been committed to the Illinois Youth Commission and at the time in question was on parole. After defendant failed to appear for the polygraph examination an unidentified deputy sheriff called his parole officer, who authorized defendant's arrest for a parole violation. The parole officer described the violation as "acting out a little" and not being home evenings. He admitted to having no direct knowledge of such parole violations.

At 8 p.m. that evening Detectives Coots and Meyers arrested defendant for the parole violation. He was also charged with driving without a valid operator's license. The detectives took defendant to the county courthouse where he was questioned, not about the parole violation or the traffic offense, but about the July 8 shootings. The testimony is conflicting as to the length of the interrogation, and the opinions of the witnesses range from 30 minutes to two hours. The defendant testified that on this occasion he asked for a particular attorney, but was told that the public defender would be appointed by the court. Although juvenile detention facilities were available, defendant was placed in the county jail for the night.

The next morning, July 29, defendant was brought before a circuit judge on the traffic violation; the court transferred the matter to juvenile court. The court was not advised that defendant was being questioned on a murder charge, and defendant was returned to the county jail.

At 10 or 11 that morning, defendant was brought to the detective bureau where two detectives, his parole

officer and an assistant State's Attorney were waiting for him. He was again given *Miranda* warnings, and he then spoke alone for about 20 minutes with his parole officer, who urged him to submit to the polygraph examination. Defendant then spoke with the detectives again, and this time admitted that he had been on the roof at the time the fatal shots were fired, but stated that Mike Thomas had done the shooting. After defendant was again advised of his rights, a question and answer statement in which defendant repeated what he had told the detectives was taken and transcribed by a court reporter. The transcript shows that the parole officer was present when the statement was taken. Defendant testified that he did not want to take the polygraph examination, that he was asked several times to take it, and that the captain of detectives convinced him that he had to take it because he had signed for it earlier. The detectives testified that defendant had never indicated an unwillingness to take the polygraph test. At 12:30 p.m. defendant was returned to the jail and his mother was called and asked to come to the station with his brother Sam, aged 36. At 2:45 p.m., the defendant, his brother, and the two detectives drove to Chicago to the offices of Reid & Associates, arriving there at 5:05 p.m.

The examiner at Reid & Associates gave defendant a modified form of the *Miranda* warnings and informed him that he was not required to take the test. The defendant was with the examiner in a 10-foot-by-10-foot windowless room for one hour and 10 minutes, after which time he was informed that he had failed the test. It was at this time that defendant made the statement in which he admitted the shootings of July 8 and admitted that he had intended to kill the victims. At 7 o'clock the detectives, defendant, and his brother left Chicago, and arrived at the sheriff's office in Rockford at 9 p.m.

Defendant's mother was called by the detectives, was told that her son had admitted the killings and that a

statement would be taken from him that evening. Asked if she wanted to be present during the taking of the statement, she responded negatively, and stated that she would come down in the morning. After again being advised of his rights under *Miranda,* defendant, in response to interrogation by an assistant State's Attorney, made a formal statement which was admitted into evidence at the trial. In the statement he admitted firing the fatal shots but did not state that he intended to hurt the boys.

Defendant contends that merely admonishing a juvenile of his constitutional rights does not insure that a statement subsequently made was voluntary. He argues that although defendant's statement to the polygraph examiner was made under conditions which would render it voluntary if made by an adult, that under the more exacting standards applicable to juveniles, it cannot be considered as having been voluntarily made by defendant. He argues further that "When considered in the light of the conditions under which it was made, the Defendant's other statements and his age and mental capacity, the statement is also 'testimonially untrustworthy.' " He argues, too, that absent the erroneously admitted statement to which the polygraph examiner testified, the evidence would support a conviction for involuntary manslaughter, but not for murder.

Whether a statement was voluntarily given must be determined from "the totality of the circumstances" (*People v. Prim,* 53 Ill.2d 62, 70) and consideration must be given to "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 36 L. Ed. 2d 854, 862, 93 S. Ct. 2041, 2047.

In *In re Gault,* 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428, after holding that the constitutional privilege against self-incrimination was applicable in the case of juveniles, the Supreme Court said:

"We appreciate that special problems may arise

with respect to waiver of the privilege [against self-incrimination] by or on behalf of children, and that there may well be some differences in technique—but not in principle—depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S. Ct. 1428, 1458.

In *People v. Turner,* 56 Ill.2d 201, this court said:

"The purpose of advising an accused of his rights is to enable him to make an intelligent decision, and to understand the consequences of that decision, and the fact that the advice was iterated and reiterated, and that he said he understood it, is of little consequence unless the defendant was possessed of the intelligence to understand the admonition. Although there is no doubt that defendant was advised of his rights as mandated by *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the question presented by this record is whether he knowingly waived those rights. In *Johnson v. Zerbst,* 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, the Supreme Court said: 'A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must de-

pend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'

This court has long recognized that the mental capacity of a defendant must be taken into consideration in determining whether his actions were voluntary (*People v. Klyczek,* 307 Ill. 150, 155) and while mental deficiency, of itself, does not render a confession involuntary (*People v. Hester,* 39 Ill.2d 489) it is a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession made [Citations.] " 56 Ill.2d 201, 205.

In denying defendant's motion to suppress and holding the statement admissible, the trial court said:

"I suppose the basic question we have to answer here is whether or not a boy 16 years old who is charged as an adult should be handled differently than an adult in his being advised of his rights.

It would be my holding first of all, that he shouldn't be handled any differently than an adult. I think in this particular case he was handled somewhat differently in that his mother and brother were brought into the picture as much as possible, apparently."

It is evident that in reaching its conclusion that the statement was voluntary the circuit court did not use the "special care in scrutinizing the record" (*Haley v. Ohio,* 332 U.S. 596, 599, 92 L. Ed. 224, 228, 68 S. Ct. 302, 304) required in this case of a 16-year-old borderline-mentally-retarded boy.

We are unable to say, on this record, that the evidence, evaluated under the proper standards, fails to support a finding that the statement was voluntarily made. The question of voluntariness, in the first instance, however, is for the circuit court.

We conclude, therefore, that the appropriate judgment

to be entered here is to vacate the judgment of the circuit court and remand the cause for a determination of the voluntariness of defendant's statement. If upon consideration of the evidence, in the light of the views expressed in this opinion, the circuit court determines that the statement was voluntary it will enter a new judgment reinstating the conviction. (*People v. Blumenshine,* 42 Ill.2d 508.) If it determines that the statement was not voluntary it will grant defendant a new trial.

Because the circuit court may reinstate the judgment of conviction, it is necessary to consider defendant's contention that the sentences imposed were excessive. Most of the cases cited by the People in support of its argument that the sentences were not excessive antedate the Constitution of 1970, which provides:

> "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. (1970), art. I, sec. 11.

On this record, however, we are unable to say that the sentences imposed were not determined in accordance with the constitutional provision.

For the reasons stated the judgment of the circuit court of Winnebago County is vacated, and the cause is remanded for further proceedings consistent with this opinion.

*Vacated and remanded, with directions.*

MR. JUSTICE RYAN, dissenting:

I cannot agree with the opinion of the majority of this court which vacates the judgment and remands this case to the circuit court to determine if the confession was voluntarily given. The circuit court has already conducted a hearing and determined that the confession was voluntary. It appears to me that this court is asking the circuit court to perform this same function again.

Of course, the test of the admissibility of a confession

is voluntariness. This is so whether the confessing person is an adult or a child. *Haley v. Ohio,* 332 U.S. 596, 92 L. Ed. 224, 68 S. Ct. 302, cited in the majority opinion, does not change this criterion. In *Haley* the court advised that certain factors may influence a child that would not influence an adult. Therefore, when a child is involved, a court should use special care in scrutinizing the record to ascertain if some influence did overcome his will to resist in such a manner as to render his confession involuntary. The opinion of this court assumes that the trial judge did not use special care in ascertaining if the confession is voluntary. There is nothing in this record which indicates that special care was not exercised or that the trial judge did not apply the proper standards.

The court apparently has based its assumption of a lack of special care on the statement the trial judge made in passing on the motion to suppress the confession to the effect that a 16-year-old boy should not be handled differently than an adult. The statement is set out in the opinion. The sentence immediately preceding this statement, which is also set out in the opinion, clearly shows that the judge was, at that time, not talking about a determination of the voluntariness of the confession, but he was discussing whether "a boy 16 years old who is charged as an adult should be handled differently than an adult *in his being advised of his rights.*" (Emphasis added.)

Later in the court's decision, the judge referred to the question of whether the statement of the defendant was voluntary. He there indicated that in arriving at his decision he also considered the fact that the defendant's mother and brother had consented to the taking of the polygraph examination.

In my opinion the proper standards were applied by the trial judge in determining the admissibility of the confession; the record does not indicate that the trial judge did not give special consideration to the circumstances surrounding the confession, and there is no reason to

remand the case to the trial court for another hearing on the voluntariness of the confession.

Using the "special care in scrutinizing the record" standard of *Haley*, I am convinced that the trial court's finding that the confession was voluntarily given is supported by the overwhelming weight of the evidence. There was no attempt to take advantage of the defendant's tender years. When he first agreed to take the polygraph examination his mother was present and also agreed that he should take the examination. He was then released from custody with the understanding that he would meet the officers the following day to go for the examination. When he was told by one of his brothers that "a lie test couldn't be beat," he didn't keep his appointment with the officers. Later after he had again been picked up by the police and after talking to his parole officer, he said he would take the polygraph examination if someone would go with him. His brother Sam was then asked and was permitted to accompany the defendant and the officers to Chicago for the examination. His brother Sam was called into the examining room when the defendant admitted to the officers that he had shot the victims. Upon the return to Rockford the defendant's brother remained with him. The defendant's mother was called by an assistant State's Attorney that night. She was told that the defendant had admitted the shooting and that a statement was going to be taken from him. She was asked if she wanted to be present and she said that she did not but that she would come to the police station the following morning. Regardless of his youth the defendant was well aware of his rights. He testified that when he was given his *Miranda* warnings, he understood that he had a right to have a lawyer present. He asked the officers to call a particular lawyer who had represented him before, but he was told that the court would appoint the public defender. I am convinced from the evidence in the

record that in spite of his age the defendant was quite knowledgeable concerning the proceedings and his rights.

For these reasons I would not remand the case to the trial court.

UNDERWOOD, C.J., joins in this dissent.