THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KISHOR H. SHAH, Defendant-Appellant.

First District (5th Division)   No. 83—2785

Opinion filed June 30, 1986.

334

PINCHAM, J., dissenting.

George C. Pontikes, of Foss, Schuman & Drake, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial defendant, Kishor H. Shah, was convicted of voluntary manslaughter for killing his wife and was sentenced to a five-year term of imprisonment. On appeal defendant contends: (1) certain statements made by him should have been suppressed because defendant's emotional condition at the time the statements were made precluded a voluntary, knowing and intelligent waiver of his rights; (2) defendant's sentence was excessive.

We affirm.

Defendant does not challenge the sufficiency of the evidence adduced at trial. That evidence, which included the inculpatory statements at issue, established that during a violent fight between the defendant and his wife she fell down their basement stairs, sustaining severe head injuries which caused her death over one month later. At the ensuing trial the jury found defendant not guilty of murder, but guilty of voluntary manslaughter.

We first consider defendant's contention that the trial court should have suppressed certain statements made by him. The statements at issue were made: (1) to a fireman and a paramedic at defendant's home on the morning of the occurrence; (2) to Sergeant Gary Konzak later that morning at defendant's home; (3) to assistant State's Attorney Frank Nowicki at the La Grange police station between 2 and 3 p.m. that same day.

At the hearing on defendant's motion to suppress these statements the following pertinent testimony was heard. Officer Arthur Schwaegerman of the La Grange police department testified that he arrived at defendant's home just before the ambulance crew and he

overheard defendant's conversation with the paramedic and fireman. The defendant appeared calm and responded to their questions. Schwaegerman summoned his supervisor, Frank Krebs, to the house. At this time the defendant was seated on the floor. He appeared calm although on occasion he would weep quietly. Krebs advised defendant of his rights, and defendant stated that he understood them. At that time Dr. Jawed Fareed arrived. He and the defendant discussed making medical arrangements for defendant's wife. Defendant's conversation with Fareed was coherent.

Subsequently Sergeant Konzak arrived and, on his instructions, Schwaegerman again advised defendant of his rights. Defendant stated that he understood them. For the next 5 or 10 minutes Konzak questioned defendant, who gave understandable responses to all his questions. Defendant appeared calm and was not crying during this questioning. He was then taken to the police station.

Sergeant Konzak testified that when he arrived he heard the defendant making medical arrangements on the telephone. When questioned the defendant seemed quite calm and gave understandable responses to all questions. He did not cry and was never in a hysterical or emotional state. He did not appear to have any difficulty understanding Konzak.

Konzak saw the defendant again at about 1:30 p.m. at the police station, eating lunch in Konzak's office. He permitted defendant to make several telephone calls to inquire about defendant's wife's condition. In these calls, made to his wife's hospital and to the neurosurgeon who operated on her, defendant conversed about his wife's condition using medical terms. According to Konzak, defendant was very calm. At about 2 p.m. assistant State's Attorney Nowicki arrived, informed defendant of his rights, and took a statement from him. During this half hour of questioning defendant gave understandable responses to all questions. He did not weep.

Nowicki testified that defendant indicated he understood all the rights read to him. He then responded to all questions responsively and clearly. He appeared alert, very calm, and very unemotional. Most of defendant's statement was in narrative form.

The only defense witness who saw or spoke to the defendant during any of the questioning at issue was Dr. Jawed Fareed, a pharmacologist and self-described close friend of the defendant. At about 9 a.m. on the day of the occurrence defendant telephoned Fareed and told him that something disastrous had happened. Defendant was crying, grief stricken, and not "collected." At defendant's request Fareed went to defendant's home, arriving about 9:45 a.m. There he

saw the defendant who started crying and repeatedly asked Fareed what was going on and what happened to his wife. Fareed found defendant to be incoherent and totally incomprehensible, making unrelated statements and asking the police what they did when they quarreled with their wives. In Fareed's opinion the responses defendant gave to Sergeant Konzak did not make any sense. Defendant told the police about the incident, but also spoke to them of "irrelevant" things. Defendant was taken to the hospital where he signed a form authorizing an operation on his wife. At the hospital he was leaning against walls, crying, and was in a "very shattered" state. Defendant was then taken to the police station where Fareed spoke to him intermittently until about 2 p.m. Defendant asked Fareed about his wife's condition and whether he knew her surgeon. When Fareed left he observed the defendant to be deep in thought, calmed down, but "still somewhat lost."

Attorney Joseph Spiezer, a friend of the defendant who initially represented him in this matter, testified he first saw the defendant on the occurrence date at about 2:30 or 3 p.m. at the police station. Defendant had been crying and began again when Spiezer greeted him. He was totally unresponsive to questions and was hysterical. Several times he slid off his chair onto the floor. His emotional condition remained unchanged all afternoon. At about 5 p.m. after bond was posted defendant was taken to the psychiatric unit of Loyola University Center, accompanied by Spiezer, Dr. Martin G. Lewis, and Susan L. Stakowski.

Dr. Lewis, also a friend of the defendant, first saw him about 5 p.m. Defendant was sitting cross-legged on the floor in a state of agitation and confusion. (On cross-examination Lewis conceded that he had previously seen the defendant sit on the floor on at least one social occasion and that the behavior did occur with people of defendant's East African origin.) Defendant made a series of incoherent, disjointed remarks. He was extremely unstable and in a confused state. He periodically burst into tears. According to Lewis defendant remained in an agitated, emotional condition for four or five days.

Susan Stakowski, another friend of the defendant, who had accompanied Dr. Lewis to see the defendant at the police station, testified that defendant was distraught and not in control of himself. She was unable to carry on a conversation with him. When she saw him two or three days later he was still very emotional and upset but could answer her inquiry about his condition.

Dr. Evangeline Guzman was defendant's treating psychiatrist for the nine days he remained at Loyola Medical Center. She first saw

him the day after the occurrence. The defendant was agitated and crying. His concentration was poor, and she had difficulty getting a history from him. He asked her how his wife was doing and what would happen to his children. His speech was coherent and he responded to her questions.

Dr. Guzman's opinion based on her examination of the defendant, his hospital admission records, and the testimony of his witnesses, was that he would not have been able to understand his rights on the day of the occurrence. She also believed he would not have been able to give a coherent statement concerning the occurrence. On cross-examination she conceded that she had not reviewed the testimony of the State's witnesses. She indicated that her opinion might change if the police officer who dealt with the defendant described a different mental status than the one she gleaned from the transcript of defendant's witnesses and observed the following day. However she also stated that she found it hard to believe the defendant was calm and coherent on the occurrence date given that at the hospital it took two to three days to stabilize his mental condition.

Upon evaluation of this testimony the trial judge concluded that the *Miranda* warnings were properly given and stated:

"[T]he defendant, based on the testimony, was in fact emotionally upset; however, as I understand the law, to be emotionally upset, the condition of him being emotionally upset is not ipso facto to allow *** does not ipso facto make the statements involuntary.

The consideration that the court has to give to testimony and the evidence relative to that condition is, was it created by the law enforcement authorities through trickery, or cajolery, or any other means by which they are attempting to get the person to do something he would not ordinarily do.

The other side of the coin on that point of law is, if the person is emotionally upset because of conditions created by the person; and not by their own force, then the court has to weigh that, and it is my opinion, and I find that the defendant was emotionally upset, not because of what the police had done, or any law enforcement officials, but he set up the situation.
* * *
Therefore, I find that the State has sustained its burden by a preponderance of the evidence on these matters ***. Therefore, the motion is denied."

■◣ ■ We find no merit to defendant's contention that by these remarks the court was holding that an emotional state caused by

defendant's own actions could never render his statement involuntary and inadmissible. The totality of the circumstances are to be considered when determining the voluntariness of a defendant's statement. (*People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383.) Certainly among the pertinent factors to be considered is the extent to which the defendant's will was overcome by his questioners. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) By commenting on this factor, the trial court did not discount the possibility that a statement could be involuntary because of a defendant's self-induced mental or emotional condition. In this cause the evidence on the defendant's emotional condition was conflicting. The State's witnesses indicated that although emotional at times the defendant was calm and coherent when he made the statements at issue. Dr. Fareed, the only defense witness who saw him during this period, described a very different defendant, incoherent and grief stricken much of that time. However, Fareed conceded that he heard defendant discuss the incident with the police at his home. He also stated that at the police station defendant had calmed down and was asking about his wife and her surgeon. The other defense witnesses described defendant's condition after he had made the inculpatory statement at issue and after criminal charges were brought against him. Contrary to defendant's contention the trial court was not required to accept Dr. Guzman's opinion of defendant's emotional state at the time he made the statements. This opinion was flatly contradicted by the three State witnesses who actually saw the defendant then. The State's evidence if believed established that defendant's emotional state did not prevent him from knowingly and voluntarily waiving his rights. The court's determination of credibility was not contrary to the manifest weight of the evidence, and consequently we will not disturb it on review. *People v. Phillips* (1982), 110 Ill. App. 3d 1092, 443 N.E.2d 655.

■ Defendant also contends that the trial court abused its discretion by sentencing defendant to a five-year prison term rather than granting him probation.

At the sentencing hearing the defendant presented letters from a number of professionals in his field, pathology, urging that he be permitted to continue to work in that area. Dr. Edward Paloyan, chief of the research service at Hines Veterans Administration Hospital, testified that for the last two years the defendant had been assisting him in important medical research as an unpaid volunteer. Based on these matters defendant's counsel sought probation for defendant or, in the alternative, periodic imprisonment permitting him to continue his research.

The State, citing evidence tending to show that defendant had severely beaten his wife before her death, sought an extended term for the defendant.

In imposing sentence the court recognized defendant's contribution to medicine but found that probation would deprecate the seriousness of defendant's conduct and would be inconsistent with the ends of justice. The court imposed a sentence of five years, well within the then-permissible range of three to seven years. (Ill. Rev. Stat. 1981, ch. 38, pars. 1005—8—1(a)(5), 9—2.) We find no abuse of discretion in the sentence imposed and consequently will not disturb it on appeal. *People ex rel. Ward v. Moran* (1973), 54 Ill. 2d 552, 301 N.E.2d 300; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

The judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P.J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. Defendant contends that because of his mental disturbance and his emotional instability he was incapable of knowingly and intelligently waiving his *Miranda* rights and that his statements were therefore inadmissible as evidence against him and should have been suppressed. This issue was not properly resolved by the trial court, and in my opinion, this issue has not been properly resolved by this court.

The State's evidence of the defendant's mental and emotional conditions when he made his statements sharply conflicted with the defendant's evidence. That contrasting evidence is clearly set forth in the majority opinion and need not be here repeated. It was the province of the trial court to determine the credibility of the witnesses, to weigh the evidence, to resolve the conflicting evidence and to determine the facts. The trial court did so. It found that "the defendant, based on the testimony, was in fact emotionally upset" and that "it is my opinion, and I find that the defendant was emotionally upset."

It was also the trial court's duty to resolve whether the defendant's emotional instability, from whatever source, precluded the defendant from knowingly and intelligently waiving his *Miranda* rights before he gave his statements. In my judgment, the trial court did not do so. Rather, the trial court reasoned and ruled, erroneously I submit, that because the defendant's emotional instability was not created by law-enforcement authorities, but instead was created by

the defendant, the defendant's emotional state could not be considered by the court in determining whether the defendant knowingly and intelligently waived his *Miranda* rights. The trial court reasoned:

"The consideration that the court has to give to testimony and the evidence relative to [the defendant's emotional] condition is, was it created by the law enforcement authorities ***. The other side of the coin on that point of law is, *if the person is emotionally upset because of conditions created by the person* *** it is my opinion, and I find that the defendant was emotionally upset, not because of what the police had done, or any law enforcement officials, but he set up the situation." (Emphasis added.)

The trial court failed to point out the evidence on which it based its conclusion that the defendant's emotional instability was created by the defendant. Nevertheless, based on the above language of the trial court, it is clear that the court did not consider the defendant's emotional instability in deciding that the defendant knowingly and intelligently waived his *Miranda* rights because, as the court stated, the defendant's condition was self-induced and was not created by law-enforcement officials. I find no authority in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, or in its multitudinous progeny, for this proposition.

Whether the defendant's emotional instability prevented him from knowingly and intelligently waiving his *Miranda* rights was an appropriate question for the trial court's determination. But the trial court, in making that determination, should not have excluded considering the defendant's emotional state simply because that emotional state was created by the defendant and not by law-enforcement authorities.

The majority concludes that there is no merit to the defendant's contention that the trial court's foregoing remarks constitute a "holding that an emotional state caused by the defendant's own action could never render his statement involuntary and inadmissible." The majority further concludes that "the State's evidence if believed established that defendant's emotional state did not prevent him from knowingly and voluntarily waiving his rights," and that "the court's determination of credibility was not contrary to the manifest weight of the evidence." The majority, however, does not resolve whether it was error for the trial court to exclude the defendant's self-created emotional stability in determining that the defendant knowingly and intelligently waived his *Miranda* rights.

For the foregoing reasons, I would vacate the judgment and sentence and remand the cause with directions to the trial court to deter-

mine whether the defendant's emotional instability, which the court found to have existed, precluded the defendant from knowingly and intelligently waiving his *Miranda* rights, and if so, grant the defendant a new trial, during which the defendant's statements should be excluded from evidence. If the trial court determines that the defendant's emotional instability did not preclude the defendant from knowingly and intelligently waiving his *Miranda* rights, the trial court should reimpose the judgment and sentence.