THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TONY JOHNSON, Defendant-Appellant.

First District (1st Division)   No. 1—89—3194

Opinion filed September 28, 1992.

Randolph N. Stone, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Mary Brigid Kenney, and Roseanne McDonnell, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MANNING delivered the opinion of the court:

The defendant, Tony Johnson, was convicted in a jury trial of the murder of Walter Brefford and of residential burglary of Mr. Brefford's home. The trial court sentenced defendant to concurrent terms of 35 years' imprisonment for the murder and 10 years' imprisonment for residential burglary.

On review, defendant raises six issues. First, he contends that the State failed to sustain its burden of proving defendant's statements were voluntary and admissible in light of (1) the arresting officer's failure to attempt to notify defendant's parents or to take defendant to a juvenile officer before his first interrogation and (2) his failure to take defendant to the available youth officer before the second interrogation. He next maintains that the court erred in rejecting his claim that his written confession was involuntary due to the taint of his prior oral statements. Defendant also asserts that the court erred in giving State-proffered instructions to the jury which related to a defense which he had not raised, and the court also erred when it refused defense instructions to the jury on voluntary manslaughter.

Defendant claims that he was deprived of a fair trial due to the prosecutor's improper erroneous and highly prejudicial rebuttal argument. Finally, defendant contends that the court improperly instructed the jury on the law that it could convict defendant of felony murder since the homicide occurred during the commission of residential burglary.

HEARING ON THE MOTION TO SUPPRESS

Prior to trial, defendant moved to suppress his oral and written statements to the authorities on the basis that he was a juvenile and the arresting officers violated the Juvenile Court Act. (Ill. Rev. Stat. 1983, ch. 37, par. 703—2.) He contends that the arresting officers failed to notify his mother about the arrest and failed to provide him with a youth officer prior to questioning him at the courthouse immediately following his arrest. Additionally, there was no youth officer present during police questioning of defendant at the police department.

The State presented the testimony of three witnesses: one of the arresting officers, Detective Michael Kill; Assistant State's Attorney William Lacy; and youth officer Patrick Danaher. Detective Kill testified that on September 26, 1986, at approximately 11 a.m., he arrested defendant on a warrant in a hallway outside a juvenile courtroom and took defendant to a small room away from the corridor. At that time he read defendant *Miranda* warnings and inquired if defendant understood them. The defendant responded "yes" to each of his rights individually. He also informed defendant that any statements made by him could be used to charge and prosecute him as an adult. While Detective Kill and his partner, Detective Thomas Byron, escorted defendant to a police vehicle parked outside the building,

defendant made no denial of involvement, but explained what had happened.

They arrived at the third district station at approximately 11:40 a.m. and defendant was placed in an interview room. Detective Kill had spoken to defendant's mother on several occasions in the past month and attempted on the day of the arrest to reach her by telephone but was unsuccessful. He then informed youth officer Danaher of the situation and, about five minutes later, received a call from defendant's mother, Mrs. Johnson. In that conversation Detective Kill told Mrs. Johnson that the defendant was in custody at the station and she could come into the station. Mrs. Johnson allegedly responded that she would come when she was ready.

Detective Kill then returned to the interview room and again informed defendant of his rights. Only the defendant and Detective Kill were in the room when defendant repeated information which he had earlier related to the police. During this discussion, which continued until 12:15, defendant gave more details. Detective Kill also asked Detective Byron to contact the State's Attorney's office, and the police then obtained lunch for defendant.

Assistant State's Attorney William Lacy arrived at the station at 12:30, spoke with the officers and reviewed the police reports. At about 1 p.m. Lacy interviewed defendant in the presence of Detective Kill and youth officer Danaher. An hour later, defendant provided another statement that was recorded by a stenographer, and the written statement was then approved and corrected by defendant and witnessed by Detective Kill, Lacy and Danaher. Detective Kill also stated that defendant never made any requests to call his mother and denied that he or Detective Byron promised defendant leniency or release from custody in exchange for his statements.

Lacy's testimony was substantially similar to that of Detective Kill. He stated that when he first entered the room around 1 p.m. the defendant, youth officer Danaher and Detective Kill were present. He advised defendant that he was an assistant State's Attorney and a lawyer who worked with the police, but he was not defendant's lawyer. He informed defendant of his rights and inquired if he understood those rights prior to any conversations. Defendant acknowledged that he understood his rights. Lacy then took the statement, read it out loud to defendant after it was transcribed, and at the end of each page asked if he wanted to make any changes or corrections. Defendant made some corrections, initialling each one and each page and signed the last page. Lacy also asked whether anyone threatened or promised to give defendant anything "in order to give this state-

ment" and defendant responded "No." Defendant never requested to call his mother.

Youth officer Danaher's testimony also corroborated the testimony of Detective Kill. He testified that he was the youth officer in the area and that Detective Kill told him defendant was in custody and that they might need a youth officer to sit with the assistant State's Attorney. He was present in the interview room with defendant, Lacy and Detective Kill and heard Lacy advise defendant of his rights. Danaher was also present when defendant made another statement in the presence of a court reporter. Danaher acknowledged that he never asked defendant any questions.

Following the court's denial of defendant's motion for a directed finding, the defense called Mrs. Johnson as a witness. Mrs. Johnson testified that the police first contacted her about her son on August 29, 1986, and thereafter contacted her or someone in her home on several occasions; however, no one contacted her on the 26th, 27th, or 28th of September. Instead, she learned of defendant's arrest from "people in the neighborhood." On cross-examination, Mrs. Johnson admitted lying to the police about defendant's whereabouts and prior knowledge of defendant's detainment at the Audy Home on September 11, 1986.

Defendant testified that he was 16 years old on September 26, 1986, at the time of his arrest at the juvenile court. At the police station, defendant was shown some pictures which he recognized. He also was asked if he committed murder to which the defendant did not respond, but asked to "call his mama." One of the officers, not Detective Kill, told defendant he would not be locked up if he told them what happened. Defendant stated that he then changed his statement and the officers again left the room, but he was never advised of his rights until the State's Attorney arrived. On cross-examination, defendant admitted that he never told youth officer Danaher or Lacy that the police had made promises to him. He also admitted acknowledging during the interrogation that he had been treated well by the police and given food and drink. Although defendant was taken into custody at the Audy Home on the day of his arrest, he did not call his mother until 2 a.m. on September 27, 1986, at which time no one answered.

Detective Byron was called as a rebuttal witness. He testified that he was with Detective Kill when defendant's mother telephoned the station. He also called the State's Attorney's office and got a sausage sandwich and milk for defendant. No promises or threats were ever

made to defendant and defendant did not make any requests to call his mother.

The court found that the police attempted to locate the parents of defendant and that the police were not under an obligation to wait until they were found to continue with their investigation. The court determined that "the police attempted to conform to the requirements of the statute by contacting the parent of the defendant which is all that is required in the statute." The court also found that defendant's statements were made voluntarily without coercion and the motion to suppress was denied.

Defendant first contends because the State failed to show proper concern for his rights and needs as a juvenile pursuant to the Juvenile Court Act, his statements to arresting officer Kill should have been suppressed. Defendant urges that the State did not sustain its burden of proof based upon the totality of the circumstances that his will to resist confessing was not overborne by factors of fright, overreaching or ignorance. (*People v. Berry* (1984), 123 Ill. App. 3d 1042, 463 N.E.2d 1044.) Defendant argues that the trial court's finding of voluntariness is against the manifest weight of the evidence and he asks this court to reverse on appeal.

Defendant also asserts since the oral statements were illegally obtained, the effect carried over to influence him at the time of his written confession and that the State failed to sustain its burden of disputing the taint. (See *People v. Taylor*, 33 Ill. 2d 417, 211 N.E.2d 673.) He further asserts that neither did the State overcome a presumption that the written statement was the product of the same improper conduct surrounding the prior multiple confessions. *People v. Reed* (1984), 123 Ill. App. 3d 52, 59, 462 N.E.2d 512.

The State first contends that the requirements of section 3—2 of the Juvenile Court Act do not apply, since defendant here was arrested for murder and is subject to the authority of the Criminal Code of 1961 rather than the Juvenile Court Act. (*People v. Green* (1988), 179 Ill. App. 3d 1, 535 N.E.2d 413.) Even if defendant was entitled to the protections of the Juvenile Court Act, the State maintains that the actions of the arresting officers were sufficient to meet the requirements therein. *People v. Baxtrom* (1980), 81 Ill. App. 3d 653, 402 N.E.2d 327; *People v. Holcomb* (1989), 192 Ill. App. 3d 158, 548 N.E.2d 613.

Section 3—2 of the Juvenile Court Act provides in part:

"A law enforcement officer who takes a minor into custody with a warrant shall immediately make a reasonable attempt to notify the parent *** that the minor has been taken into cus-

tody and where he or she is being held; and the officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes." (Ill. Rev. Stat. 1985, ch. 37, par. 703—2(1).)

If counsel is not present when an admission or confession of a juvenile is obtained, the utmost care must be taken to insure that the confession is voluntary and not coerced, suggested or the result of the juvenile's ignorance of his rights, adolescent fantasy, fright or despair, because of the unequal footing of a juvenile and an adult. See *In re Application of Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428; *People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383; *People v. Holcomb* (1989), 192 Ill. App. 3d 158, 548 N.E.2d 613.

■ The record here is clear that the arresting officer attempted to contact defendant's mother once he was brought into the station and spoke to Mrs. Johnson by telephone only minutes later when she returned his call. The youth officer who was present at the station when defendant arrived was also informed of defendant's arrest. The record is unclear, however, as to whether the arresting officers attempted to take defendant to the youth officer without unnecessary delay prior to questioning him pursuant to section 3—2(1). However, where a juvenile has been admonished with respect to his right to remain silent and to have assistance of counsel and he has understood such a warning, a police officer's failure to comply with section 3—2 does not preclude admission of defendant's statement. *People v. Steptore* (1972), 51 Ill. 2d 208, 281 N.E.2d 642.

We have reviewed the evidence in this case and conclude that the failure to immediately take defendant to youth officer Danaher or wait until his mother came to the station did not preclude admission of his statements. He was repeatedly given his *Miranda* warnings, and he repeatedly acknowledged he understood them and indicated he would give a statement. Additionally there was evidence that youth officer Danaher was contacted, was present during the final interrogation, and that defendant's mother had been called. Mrs. Johnson gave no indication when she would come to the station. There was no evidence that defendant requested an attorney and was denied counsel.

Illinois courts have recognized that it is preferable that the parents of a juvenile be present when a juvenile waives his rights (*In re Bertrand* (1978), 65 Ill. App. 3d 703, 382 N.E.2d 660) but have held that the absence of the accused juvenile's parents or guardian does not render ineffective an otherwise valid waiver of constitutional rights. (*In re Stiff* (1975), 32 Ill. App. 3d 971, 336 N.E.2d 619.)

Rather, the fact that there has been a violation of section 3—2 of the Juvenile Court Act is at most a factor in determining whether subsequent statements were voluntarily made. *People v. Creach* (1979), 69 Ill. App. 3d 874, 890, 387 N.E.2d 762, *aff'd in part & rev'd in part on other grounds* (1980), 79 Ill. 2d 96, 402 N.E.2d 228.

Whether a statement was given voluntarily should be considered in light of the totality of the circumstances. (*People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383.) Although there is a need for careful scrutiny of statements made by minors, the factors to be considered in determining voluntariness are the same for both minors and adults. *People v. Prude* (1971), 66 Ill. 2d 470, 363 N.E.2d 371.

Consideration must be given to: (1) the characteristics of the accused; (2) the details of the interrogation; and (3) whether the statements were induced or compelled by threats or promises from law enforcement officials. (*People v. Simmons*, 60 Ill. 2d at 179; *People v. Hattery* (1989), 183 Ill. App. 3d 785, 539 N.E.2d 368.) In the present case, the totality of the circumstances surrounding defendant's oral statements here establishes that the statements were made voluntarily. There is no evidence of incapacity or handicaps on the part of defendant. There is testimony that defendant was repeatedly given his rights, and even looking at defendant's testimony, he acknowledged being advised of those rights by the State's Attorney during the final interrogation. There was no evidence of physical or mental abuse; defendant was held at the station for only a few hours. Unlike the cases relied upon by defendant, he was given his *Miranda* warnings prior to the statement, there was no evidence of subnormal intelligence, and there was no evidence that he was interrogated after repeated requests to see his mother were refused and while his mother was present in the building. With respect to the voluntariness of the written statement, there was a break in the stream of events between the taking of the oral statements and those leading up to the written statement.

In sum, an examination of the totality of the circumstances in this case convinces us that defendant's confession was voluntary. Any delay which occurred in the youth officer's presence in the interview room was mitigated by the fact that defendant signed the written statement, put into evidence at trial, only after youth officer Danaher remained in the room at the station, and defendant was again informed of his rights by Assistant State's Attorney Lacy.

Accordingly, we conclude that the trial court's denial of defendant's motion to suppress was not contrary to the manifest weight of the evidence.

TRIAL PROCEEDINGS

The State called Joseph Crossley as a witness. He testified that he was the nephew of the victim, Mr. Brefford, and that on August 27, 1986, he arrived at his uncle's house shortly after 4 p.m. He saw a milk crate on the side of the house under a broken window. When he entered the front door using keys obtained from his mother, he saw the body of his uncle lying on the floor between the living room and dining room. He went back outside and instructed his sister to go to the home next door and call the police.

Julius McGee testified about a traffic incident which occurred on August 17, 1986. Mr. McGee had just parked his car and gone up the stairs into his home when he heard a noise and someone said ''McGee your car's been hit.'' He ran down the stairs and saw a big, dark-colored car driven by a young, black teenager. The driver attempted to flee, but McGee held him until the police arrived.

Officer Brannon testified that at about 9:30 p.m. on August 17, 1986, he investigated a traffic incident and placed the person who was found inside an old model Lincoln under arrest. He identified that person in court as the defendant. When Officer Brannon searched the car, he found a wallet containing identification and charge cards. He collected some items from the car and had it towed to the fourth district station. When Brannon called in the license plate number of the car to a zone officer, he learned that the car belonged to Walter Brefford. At the station, Brannon inventoried the items and sent a copy of the inventory sheet to Mr. Brefford's address. Defendant told Officer Brannon that he resided at 124 West 72nd Street. Brannon then issued two traffic citations and turned defendant over to the desk sergeant. Defendant was released after his mother was called.

Dr. Choi, a pathologist at the medical examiner's office, also testified. He conducted the autopsy on the victim. He stated that the body appeared to be that of a male 76 years old and that it was decomposed and infested. Dr. Choi also conducted an internal examination and discovered six fracture scars concentrated in the forehead area. He could not determine what had caused the markings but concluded that ''mechanical instruments'' rather than a fall or bump into a door caused the fractures. He determined that the damage seen was consistent with the victim being struck with an object or tool such as a screwdriver. The doctor concluded that the cause of death was blunt trauma to the head as indicated by the fractures.

Detective Kill testified that he was in charge of the investigation of Mr. Brefford's murder. He searched the scene on August 27, 1986,

and observed two letters from the Chicago police department that were addressed to the victim. One was an inventory slip and the other was a letter notifying the victim that his car had been impounded. Detective Kill then went to the third district station and spoke to Officer Brannon. After speaking to Brannon, he began to look for the defendant.

Between August 27 and September 22, Detective Kill made several visits to defendant's home and spoke to defendant's mother, Mrs. Johnson, at least a half dozen times by telephone. On September 22, 1986, he spoke to Roderick Beard and Anthony Ratcliff and thereafter obtained an arrest warrant for defendant. Detective Kill also testified to the events surrounding the arrest of defendant and the taking of defendant's statements and such testimony was consistent with his testimony at the suppression hearing.

Detective Kill also testified about the statements defendant made to him as follows. Defendant told Detective Kill that he saw Mr. Brefford leave his home and thereafter entered the house with the intention of taking video equipment. While defendant was inside the house Mr. Brefford returned. Defendant attempted to escape but Mr. Brefford tried to stop him. As defendant punched Mr. Brefford two or three times, Brefford staggered backward and picked up a holster with a revolver in it. As the men struggled, the holster opened and the bullets fell out. Defendant took the gun. However, because Mr. Brefford continued to pursue him, the defendant stabbed Brefford in the head and chest with a screwdriver until the man fell to the floor and twitched. Defendant then covered the body with a curtain, took a gun, some bullets and car keys. He left through a window and went home to change his bloody clothes before driving away in Mr. Brefford's car. Defendant also mentioned hitting the old man over the head with a wooden cane that the man had with him and that the cane broke. Detective Kill stated on cross-examination that defendant's statements given at the time of his arrest and at the police station were different. At the station defendant added that during a struggle for the gun, the gun discharged.

Both Ratcliffe and Beard testified to conversations each of them had on separate occasions with the defendant about his involvement in a home burglary and how the old man had returned while defendant was still in the house. Defendant related to them his attempt to flee and how the old man had grabbed him, causing the defendant to stab him. Defendant also told Ratcliffe and Beard about taking the car keys and gun from the house before leaving.

Following an instruction conference, the State then called Assistant State's Attorney Lacy to the stand. Like Detective Kill, Lacy testified to the events surrounding the taking of defendant's statements on the day of his arrest. Lacy also published defendant's written statement to the jury. On cross-examination, the defense questioned Lacy extensively about portions of the statement in which defendant described a struggle that occurred between the defendant and Mr. Brefford.

Defense then offered as evidence a stipulation of Detective Foley. It was stipulated that if called to testify Detective Foley would state he conversed with Dr. Choi by telephone on August 30, 1986, and the doctor told him the injuries sustained by the decedent could have occurred as the result of a fall.

Following a second instruction hearing, the trial court denied defendant's motion for mistrial. After the court resolved a question raised by the jury, the jurors returned with a verdict of guilty on both charges. A sentencing hearing was held where evidence was presented in mitigation and aggravation and defendant was sentenced to concurrent terms sentences.

Two jury instruction conferences were held in this case. During the first conference, the State proposed instructions concerning the absence of any justified use of force by defendant. Defense counsel objected, claiming no self-defense theory had been offered since defendant merely asserted his lack of intent to kill Mr. Brefford. The judge refused the instruction.

After the first conference, the State called Lacy as a witness and as previously mentioned cross-examined him about defendant's statements concerning a struggle with Mr. Brefford. The State again sought instructions that: (1) a person is not justified in the use of force if he is committing or escaping after the commission of a forcible felony and (2) the term "forcible felony" means residential burglary. The court agreed to allow the instruction this time, based upon its acceptance of the State's argument that defense counsel's cross-examination of Mr. Lacy necessitated the instruction.

On appeal, defendant contends that the trial court erred in giving the aforementioned jury instruction because it was misleading (*People v. Jones* (1986), 145 Ill. App. 3d 835, 495 N.E.2d 1371) and there was no evidence advanced in support of the instruction (*People v. Fleming* (1987), 155 Ill. App. 3d 29, 507 N.E. 2d 954), since he did not raise a claim of self-defense. *People v. Christensen* (1978), 61 Ill. App. 3d 856, 378 N.E.2d 612.

■ The determination of which instructions will be submitted to the jury is within the discretion of the trial judge. (*People v. Pietrzyk* (1987), 153 Ill. App. 3d 428, 435 N.E.2d 1228.) Based on the evidence presented during the trial, we find no abuse of discretion here involving the jury instructions. Defendant's statement about a purported struggle between him and Mr. Brefford during the burglary could reasonably have raised a question before the jury whether defendant was justified in his use of force which resulted in Mr. Brefford's death. However, because the law precludes a finding of justification for the use of force during the commission of a forcible felony, it was proper for the trial judge to instruct the jury on that law.

Defendant next claims that the trial court erred by denying his jury instruction on voluntary manslaughter based on the serious provocation of mutual quarrel or combat. (See *People v. Pietryzk*, 153 Ill. App. 3d at 435.) He urges where there is some evidence in the record, such as mutual combat, which if believed by the jury would lessen the homicide from murder to voluntary manslaughter, the jury should be presented with the instructions on voluntary manslaughter. *People v. Leonard* (1980), 83 Ill. 2d 411, 420-21, 415 N.E.2d 358.

■ Under Illinois law, "serious provocation" may arise from mutual combat; "mutual combat" is combat into which two persons enter willingly, or in which two persons mutually fight upon equal terms, but the defendant cannot have instigated the fight, and retaliation by the defendant must not have been disproportionate to the provocation. (*United States ex rel. Bacon v. DeRobertis* (D.C. 1982), 551 F. Supp. 269, *aff'd* (7th Cir. 1984), 728 F.2d 874.) In the present case, defendant did not meet his burden of showing some evidence of serious provocation and sudden and intense passion (*People v. Austin* (1989), 133 Ill. 2d 118, 549 N.E.2d 331; *People v. Neal* (1983), 112 Ill. App. 3d 964, 446 N.E.2d 270), because any struggle that ensued between him and Mr. Brefford did not amount to mutual combat. Further, there is no evidence that defendant was provoked into a sudden intense passion.

This court also has held that where there was evidence that a defendant participated in a robbery which led to the victim's death, the jury could not find manslaughter or reckless conduct. The court there concluded that defendant, who was charged with first-degree murder under the felony-murder rule, was not entitled to instructions on the lesser offense of involuntary manslaughter. See *People v. Ellis* (1981), 93 Ill. App. 3d 981, 418 N.E.2d 88.

Accordingly, based on the evidence in this case, we find no error in the trial court's refusal to give to the jury defendant's proffered in-

struction on voluntary manslaughter. Even so, any error in the denial of the voluntary manslaughter instruction is considered harmless error where there is overwhelming evidence of defendant's guilt. (*People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972.) Here, the evidence of defendant's guilt was overwhelming. See *People v. Pecina* (1985), 132 Ill. App. 3d 948, 477 N.E.2d 811; *People v. Moore* (1983), 95 Ill. 2d 404, 447 N.E.2d 1327.

Defendant next asserts that comments made by the State during closing argument deprived him of a fair trial. Specifically, he contends that the prosecution repeatedly denigrated the defense as a "cop-out" and that a prosecutor's arguments which involve characterizations that impermissibly diminish the strength of a trial defense are improper. Also, he urges it was error for the prosecutor to misstate and erroneously apply the felony-murder rule. Defendant contends that the definition of felony murder in effect at the time of this matter (Ill. Rev. Stat. 1983, ch. 38. par. 2—8) did not specifically include the crime of residential burglary. Even assuming residential burglary is available for use in a felony-murder prosecution, he asserts that the State misapplied the law to these facts by insisting a conviction was mandated. *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827.

A prosecutor is allowed a great deal of latitude in making the closing argument. (*People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19.) The trial court's determination of the propriety of the argument will generally be followed absent a clear abuse of discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.) In the present case, the comments of the prosecutor made during rebuttal argument were based on the evidence presented at trial; specifically, defendant's written statement and the testimony of Assistant State's Attorney Lacy given on cross-examination. The record reflects that defense counsel argued "Johnson's intent is not to do any harm to Mr. Brefford, it is to get out of the house if he can, and he is trying to do that. He committed a burglary, fine but he is not a murderer, he did not commit murder." We believe the State's comments, that defendant "didn't want to accept all of the responsibility" and "the defendant wants to cop-out," are rebuttal that refer to the legitimate inference raised by defendant that he was not guilty of murder because Mr. Brefford attempted to stop him.

Moreover, the remarks made by the defense during closing argument invited the remarks of the prosecutor now complained of, and even if the remarks were improper, defendant cannot now complain he was prejudiced by the reply. See *People v. Lewis*, 25 Ill. 2d at 446.

■ With regard to the prosecutor's comment about the law of felony murder, we find that the comments were a proper application of the law to the evidence and facts in the case (see *People v. Steffens* (1985), 131 Ill. App. 3d 141, 475 N.E.2d 606), rather than a misapplication or misstatement of the law. Further, the comments of the prosecutor were invited by the argument of counsel and therefore are not grounds for reversal. Assuming any error, such comments should not be considered as a basis for reversal because they were not so prejudicial as to result in an unfair trial or to be considered as a material factor in the defendant's conviction, without which the jury might have reached a different result. See *People v. Thompkins* (1988), 121 Ill. 2d 401, 521 N.E.2d 38; *People v. Baptiste* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.

Defendant finally asserts that the trial court further erred in reciting instructions which: (1) allowed the jury to convict him of felony murder based on the commission of the offense of residential burglary; and (2) precluded a finding that he was acting in self-defense due to the commission of residential burglary. As stated earlier, defendant urges because residential burglary is not specified as one of the forcible felonies (Ill. Rev. Stat. 1983, ch. 38, par. 2—8), it could not be used to convict him under the felony-murder rule. See *People v. Chandler* (1989), 129 Ill. 2d 233, 543 N.E.2d 1290.

■ We believe *Chandler* is distinguishable on its facts. *Chandler* involved the scope of included felonies for purposes of the death penalty sentencing, rather than an inquiry of whether "residential burglary" could be included in the general term "burglary" for purposes of convictions pursuant to the felony-murder rule. After considering the statutory language in effect at the time of this case, we conclude that residential burglary was considered a forcible felony even though it was not specifically enumerated in the statute. (See *People v. Parker* (1988), 123 Ill. 2d 204, 211, 526 N.E.2d 135.) Having reviewed the Criminal Code in whole and in part, we believe it was the intent of the legislature to include residential burglary among the forcible felonies in section 2—8. Further, at that time, burglary was enumerated as one of the forcible felonies and "burglary" is a general term which is intended to include residential burglary.

Moreover, we find that even if it can be said the legislature did not specifically intend residential burglary to be included in the term "burglary" for purposes of section 2—8, it intended the crime to be included in the more general heading of "any other felony which involves the use or threat of physical force or violence." (Ill. Rev. Stat. 1983, ch. 38, par. 2—8.) Finally, the intent of the legislature is clear

today. Under the present law, "residential burglary" is enumerated in section 2—8 as a forcible felony.

For the foregoing reason, we affirm the convictions and sentences of defendant.

Affirmed.

BUCKLEY, P.J., and CAMPBELL, J., concur.