THIRD DIVISION
MARCH 24, 2010

No. 1-08-1966

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 04 CR 21005 |
| | ) | |
| MALVIN WASHINGTON, | ) | Honorable Diane G. Cannon, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

On March 21, 2004, following a minor car accident between Antoine Lee and Antonio Washington, a steadily growing crowd gathered at the scene of the accident. Several members of the extended families of Antoine and Antonio were part of the crowd, including Antonio's cousin, defendant Malvin Washington. Eventually, a verbal altercation ensued and defendant shot Antoine's uncle and cousin, Ronald Lee and Marquis Reed, respectively. Ronald was hospitalized and treated for his wounds while Marquis died as a result of injuries suffered from his gunshot wound. Following a police investigation, defendant was charged in a multicount indictment with first degree murder, attempted murder, aggravated battery with a firearm, aggravated discharge of a firearm, aggravated battery, and aggravated unlawful use of a weapon.

The State proceeded to trial on two counts of first degree murder and one count of

aggravated battery with a firearm. On April 14, 2008, following a jury trial, defendant was convicted of charges of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2006)) and aggravated battery with a firearm (720 ILCS 5/12-4.2 (West 2006)). On May 12, 2008, defendant's motion for a new trial was denied and he was sentenced to 55 years' imprisonment for the merged first degree murder convictions and a consecutive 10 years' imprisonment for the aggravated battery with a firearm conviction.

On appeal, defendant first asserts that his defense was prejudiced by the trial court's denial of his motion for a continuance to provide additional time to investigate alleged newly discovered information concerning an incident between Antoine Lee and Charlene Parker, the mother of defendant's child. Next, defendant contends that his right to a fair trial was denied by repeated evidentiary errors by the trial court. Third, defendant contends that the trial court erred in rejecting defendant's proposed jury instructions for second-degree murder and involuntary manslaughter. Finally, he asserts that he was denied his right to a fair and impartial trial based on the trial court's exhibited bias and prejudice against him. For the following reasons, we reverse the judgment of the trial court and remand for further proceedings.

## I. BACKGROUND

### A. Defendant's First Trial

On February 25, 2008, a trial commenced on charges against defendant of two counts of first-degree murder and one count of aggravated battery with a firearm. Following the close of the State's case-in-chief, the trial court granted defendant's motion for mistrial. After the State rested and court was in recess, defendant's father approached a member of the jury outside the court building to discuss the trial. The next day, the juror informed the court and was excused.

After the trial court interviewed the remaining jurors, it found the jury had been tainted and granted the mistrial.

### B. Pretrial Proceedings For Defendant's Second Trial

On April 4, 2008, immediately prior to the commencement of defendant's second trial, defense counsel moved for a continuance. Counsel sought a continuance for the weekend so that he could investigate reports that he had received indicating Antoine Lee had recently been investigated by the police for firing a gun at Charlene Parker, defendant's ex-girlfriend and mother of his child. Counsel argued that the alleged shooting occurred on March 19, 2008, and he learned of it "a few days" thereafter, but he could not investigate at that time because he had a demand jury on a separate death penalty trial. Counsel received the police reports regarding the shooting at the hearing on his motion.

The trial court passed the case and instructed counsel to interview defendant's mother, who was at the courthouse, to determine where Parker and another witness might be found to be interviewed. When the case was recalled, defense counsel reported that the witnesses would be interviewed quickly but that he still wished to continue the case over the weekend. Based on the fact that no crime was charged for the alleged shooting and the lapse of time from the alleged act and the date of the motion and trial, defendant's motion was denied.

The trial court also considered the State's motion to affirm its rulings made prior to the first trial. The State noted that the court granted its motion *in limine* to bar defendant from eliciting evidence that Ronald Lee was on parole at the time of the shooting. The trial court granted the motion, holding that his arrest for aggravated vehicular hijacking was old and not probative, but granted defendant the right to move to admit his arrest if his testimony differed from that at the first trial. The trial court also affirmed two prior rulings from the first trial - that

the State was not precluded from bringing out evidence that defendant's cousin went to the police station with an attorney and the State was not precluded from explaining that Mario Lee died of an asthma attack at the scene.

### C. Trial Testimony

The State began its case with the testimony of Antoine Lee and Antonio Washington. Both witnesses were 25 years old at the time of trial and both testified to the automobile accident and subsequent events. On March 21, 2004, Antoine was driving his uncle's car northbound on South Lamon Avenue toward West 43rd Street. At that time, Antonio, who had borrowed Parker's car, was backing out of a parking space into South Lamon Avenue, where his vehicle and Antoine's vehicle collided.

Antoine testified that he exited the vehicle and talked calmly with Antonio about the accident. Antoine called his mother, Angela Lee, on his cell phone, but did not call the police because he did not have a driver's license. Initially, a small crowd of seven or eight people was at the scene, but that number grew steadily to "about like a hundred" people. Defendant and his sister, Topeka Washington, were among the first people to arrive. Defendant began to argue with Antoine about who was going to pay for the damage to the car. Antoine testified that Topeka attempted to calm them down. Eventually, Antoine saw his uncle, Ronald Lee, approach and tell defendant "get the f--- away from my nephew," or something to that effect.

Antoine testified that Ronald told him that they should leave and they started to walk off. Antoine testified that he then heard two or three gunshots and saw fire from the gunshots coming from defendant's pocket. He then ran and drove home. He testified that the police came around and handcuffed whomever they knew was at the scene and brought them in for questioning. Antoine admitted that he gave a statement to the police that he saw defendant pull a gun from his

pocket and fire the shots. On cross-examination of Antoine, the State's objection to defendant's inquiry into Antoine's two prior convictions for unlawful use of a weapon was sustained.

Antonio testified that he was dazed at that time and did not recall having any conversations. He did recall hearing shouting and hearing someone saying "get the f--- away from my nephew." Antonio did not have any recollection of any other specifics surrounding the shooting. He also did not recall details from the statement that he gave the police, specifically that the situation escalated when defendant and Topeka arrived on the scene.

Angela Lee testified that after she talked to Antoine, she asked her sister, Yvette Reed, to drive her to the scene of the accident. Angela, Yvette and Donald Lee left the house, picking up Yvette's son, Marquis, on the way. When they arrived at the scene, there were approximately 10 people there and Angela exited the car alone to approach Antoine. Angela testified that Antoine was having a conversation with defendant that appeared to be normal and she did not see anyone get physical with defendant. She said that she looked up and her brother, Ronald Lee, walked up to the group. Angela testified that Ronald asked what was going on and defendant asked who he was. Ronald responded that he was talking to Antoine and said they should leave and call the police.

Angela testified that she, Ronald and Antoine then turned to leave without Ronald grabbing or pushing defendant. Defendant then started shooting in their direction. Angela testified that it did not appear he was shooting with any particular aim and that he ran away to the third of the nearby row houses when he stopped shooting. Angela testified that she ducked and fell to the ground, staying for a few minutes until police arrived. She did not know whether Antoine or Ronald was armed but did not see them with a gun that day. She said that she did not see anyone get hit by the gunfire. Angela spoke with the police officers at the scene and was

taken to headquarters before talking to anyone else from the scene. She was interviewed by officers and an assistant State's Attorney. Angela signed a written statement identifying the shooter as a black male wearing a black jacket with green stripes, black jeans and black shoes.

Donald Lee testified that he accompanied his sisters to see if he could help. He acknowledged that he was convicted of delivery of a controlled substance in 2003 and that he had a couple of beers before leaving, but denied that he was under the influence at the time. Donald testified that when they arrived at the scene, he and Marquis exited the vehicle and approached the crowd.

Donald testified that he saw Antoine arguing with "some guy" who was pushing Antoine with his body while a woman was attempting to calm the men down. He testified that his brother Ronald soon appeared, unarmed, and approached the men, pushing the other man away from Antoine. Donald then saw the other man reach to his right side with a gun and start shooting. Donald described the shooter as a younger, black man, but was unable to identify anyone in the courtroom as the shooter.

Donald testified that he did not have a gun with him-though he stated that he would have used one if he had one-so he ran away from the shooting. He returned when the shooting stopped and found Yvette holding the victim, who was bleeding. The police arrived and told him someone had to move Yvette's car, so he got the keys from Yvette and drove the car home. A squad car followed Donald and when he exited the car, the police handcuffed him and took him to an interrogation room at the police station. While in the interrogation room, Donald had an asthma attack and was treated by paramedics, taken to the hospital, and then released to go home the next day. Because of this incident, Donald never gave a statement to the police.

Yvette Reed testified that after Angela received the call from Antoine, she drove her car with Angela and Donald to go to the scene, and the group picked up Marquis when they saw him on their way. When they arrived at the scene, Yvette was unable to go directly to the scene because there was traffic blocking the street, so she stopped and stayed in her car. Angela and Donald exited to approach the accident scene. After a few minutes, Marquis exited the car to find out what was happening. Shortly after Marquis exited, Yvette heard gunshots. When the gunshots stopped, Yvette exited her car to look for Marquis and found him coming toward her with blood coming from his mouth. Yvette testified that she stayed at the curb with Marquis and gave Donald the keys to her car because he told her the police told him to move the vehicle. Eventually, someone took Yvette home and then a friend took her to the hospital, where she found out that Marquis had died.

The second vehicle of note to arrive was that driven by Ronald Lee with his wife, LaTanya McGhee, mother-in-law, Wanda Cook, Victor Lovelace, and his daughter as passengers. Wanda, Ronald, and LaTanya each testified at trial that they were returning from the grocery store and retrieving mail from Ronald's sister near the accident scene. They were stopped by traffic on South Lamon Avenue, and Ronald and LaTanya exited the vehicle. Wanda testified that people were arguing and then she saw Ronald arguing with a young man with a black hood who pulled out a gun and fired shots. Ronald approached the car and fell on the hood of the car until the ambulance came to take him to the hospital. Wanda was unable to identify the shooter in court.

Ronald testified that when he and LaTanya approached Antoine and defendant, defendant was arguing and yelling at Antoine, who remained quiet and appeared scared. Ronald asked

Antoine what was going on. He testified that he then pushed Antoine and defendant apart so that they would not fight. Ronald testified that he told Antoine that they should leave and he turned to leave when a young woman told him that people minding other person's business was what was wrong today. Ronald turned back and told the woman that it was his business as Antoine was his nephew.

Ronald testified that he again began to turn away to leave when he heard someone say there was a gun. He turned back to see defendant point a gun at him. Ronald tried to turn and flee but was shot three times before he could get anywhere. Ronald testified that he did not see the defendant actually pull the trigger as he was trying to run away, but he identified defendant in court. He also testified that defendant was wearing a green and black hoodie on the day of the shooting.

On direct examination, Ronald acknowledged that he was convicted of aggravated vehicular hijacking and possession of a controlled substance in 1999. On cross-examination, defense counsel was prohibited from asking Ronald about the convictions. In addition, the trial court prohibited questioning Ronald as to whether he was on parole at the time of trial and whether it was legal for him to own or possess a firearm.

LaTanya testified that when Ronald approached Antoine and defendant, defendant was yelling "what's up Lord?" Ronald asked Antoine what was happening and then told him that they should leave and call the police. LaTanya testified that defendant started to argue with Ronald. Defendant's sister approached and also started arguing with Ronald. LaTanya testified that when Ronald turned to leave, she saw defendant pull out a gun from his black and green hoodie, point it at Ronald and her nephew Marquis, and shoot them. LaTanya testified that she saw three shots fired but heard five total and saw Ronald immediately grab his stomach.

LaTanya denied seeing Ronald push or choke defendant and did not hear him tell defendant to get away from Marquis.

Additional testimony was presented regarding the police investigation and the evidence supporting the State's case. Two bullets and three shell casings all were identified as fired from the same gun. One of the bullets was recovered from Marquis's body where he suffered an "atypical" gunshot wound to his chest that caused bleeding into the pericardial sac surrounding his heart. The entry wound indicated that the bullet found in Marquis' chest may have struck an intermediate object or person prior to entering Marquis' body. His death was determined to be caused from bleeding into the pericardial sac surrounding his heart. The State rested.

After defendant's motion for directed verdict was denied, the trial court first rejected defendant's request to recall the detective that interviewed Antonio in order to impeach Antonio's testimony that he did not remember telling the police that someone said "get the f--- a way from my nephew." Defendant presented the testimony of several witnesses, including his own testimony, in support of his claim of self-defense. Defendant presented the testimony of police officers who reported to the scene after the shooting. Testimony was elicited that it is common practice to separate witnesses before interviewing them and that witnesses were not handcuffed before being taken to the police station to be interviewed.

Finola Horad testified that she was at her neighbor's house adjacent to the scene at the time of the shooting when she heard between three and five gunshots. Finola testified that she immediately dropped to the floor, but quickly looked out the front door because her daughters were due back from the store. She saw a man wearing a black hoodie and black jeans standing in the street holding a gun and someone lying on the ground near the man and she shut the door. She could not see the man's face or identify him.

Finola testified that later that day the police knocked on her door but she refused to answer because of the neighborhood she lived in and the impressions people would form. However, the next day Finola and her son found a bullet in the frame of her window and she called the police. She granted the police access and spoke with them when they arrived on March 22, 2004.

Defendant's sister, Topeka, testified that after Antonio had left her house, he returned to tell her that he was in an accident. Topeka went outside to see what had happened and saw Antonio and Antoine talking to each other. Topeka testified that Antoine told her that he did not know what happened but thought a trash can may have blocked his line of sight. Antoine then got on his cell phone and Topeka also called Charlene's cell phone to tell her that her car had been in an accident. Defendant answered the phone and Topeka informed him of the accident.

Topeka testified that after calls were made, Antoine and Antonio then went back and forth about the accident, which Topeka classified as arguing in a medium tone and that it never escalated. Defendant arrived at the scene first and asked Topeka and then Antonio what happened. Topeka testified that defendant remained calm during these discussions. Then, Angela, Donald and Marquis arrived. At this time, Antoine went to his car and began digging around the car looking for something and defendant went to Charlene's car. After Antoine and defendant returned from the cars, a car pulled up and Ronald exited and approached them.

Topeka testified that Ronald was angry when he approached the group and things got out of hand. She testified that Ronald said something to defendant about his nephew, "like, are you F-ing with my nephew[?]" Defendant responded that he was not, but Ronald charged at defendant and pushed him with both hands. Topeka testified that Angela grabbed Ronald to try and settle him down and Topeka asked him why he was pushing defendant when they were

acting like adults. Topeka testified that Ronald said "B, shut up before I slap you." Topeka responded that everyone needed to calm down since it was just a car accident, but Ronald then charged at defendant and tried to choke him. Ronald did not push or slap Topeka at any time.

Topeka testified that she next heard a gunshot. She began to run away back to her house. When she looked over her shoulder, Topeka saw Donald behind her with a gun in his hand. She saw Donald looking at the gun and she testified that it appeared jammed from his actions and she was able to get inside her house. She did not know if Donald fired any shots and did not know who fired shots, she only heard shots and ran away. Topeka went to her mother's house about 30 minutes after the shootings and did not talk to the police at any time, even after defendant had been arrested for murder.

Finally, defendant testified on his own behalf. After Topeka called him and told him Antonio had been in an accident, he knew that Antonio was driving his girlfriend's car so he walked over to the accident scene, picking up Topeka on the way. Defendant testified that he saw that the car was damaged, asked Antonio if he was hurt and saw Antoine on the phone. Defendant testified that he had known Antoine, Ronald and Donald for more than ten years.

When Antoine finished on the phone, he approached with a raised voice toward Antonio. Defendant testified that he told Antoine to calm down and that he would talk to Charlene about the damage if Antoine did not have a license and did not want to call the police. Antoine told defendant not to worry about it and walked away. Defendant told Topeka that he needed to retrieve something from the car and went to the car to retrieve pictures of his son and a gun. He had purchased the gun, a 9-millimeter semiautomatic, a few weeks prior as an investment from a man in his neighborhood. Defendant testified that he knew that if police came they would search the cars for drugs and alcohol, so he put the gun in his black and green Milwaukee Bucks jacket

pocket.

Defendant testified that he intended to return to the crowd to tell Topeka that he was going to walk to her house for a minute, but when he got to her someone came from behind him, grabbed his neck, pushed him, and told him to "get the f--- away from my nephew." Defendant then realized it was Ronald who had pushed him, and he told Ronald not to put his hands on him. Defendant stated that Ronald continued to yell at him. Despite Angela's and Topeka's efforts to calm everyone down, defendant testified that Ronald again grabbed his neck and defendant pushed back against him.

Defendant testified that Ronald then reached in his waistband for a gun. Defendant saw a gun, so he reached out to push Ronald's arm out of the way. Because he was scared that he might be shot, defendant shot Ronald twice. Defendant testified that he heard one or two additional shots from his left side, but did not see who fired them. Ronald then lunged at defendant, so he shot him one final time. Although he aimed to hit Ronald in the leg, defendant stated that the final shot hit Ronald in the stomach.

Defendant testified that he then ran away. He continued to run because someone continued to shoot at him. Defendant testified that he saw Donald chasing him with a gun, but Donald's gun jammed. Defendant continued running to a friend's home. Six months later, he was arrested. Defendant stated that he was unable to find anyone to come forward to report what really happened because of the general mistrust of the police in the area.

Defendant attempted to call Rhonda McKelvin pursuant to *People v. Lynch*, 104 Ill. 2d 194, 200 (1984), to testify to Ronald's 1999 conviction for attempted vehicular hijacking. Defendant argued that McKelvin would testify to Ronald's propensity to violence based on his attempt to hijack the vehicle she was in with the use of a pistol. The trial court heard argument

on the issue and denied defendant's request to call the witness. The court reasoned that, weighing the *Lynch* factors, the witness would be precluded. Specifically, it stated that Ronald testified to the conviction, the act occurred 12 years prior to trial, the act occurred nowhere near the scene of the accident, and defendant testified to his fear and belief he acted in self-defense. The trial court concluded that defendant could argue the conviction to the jury and the jury could weigh the testimony of all witnesses and determine if defendant's actions were justified.

### D. Jury Instructions and Verdict, Posttrial Motions and Appeal

At the jury instruction conference, the trial court refused defendant's request to instruct the jury that unlawful use of a weapon was a lesser-included offense of aggravated battery with a firearm. Defendant's request for a self-defense instruction was accepted, but his requests for second degree murder and involuntary manslaughter instructions were denied. Defense counsel argued that under *People v. Lockett*, 82 Ill. 2d 546, 552 (1980), and *People v. Edmondson*, 328 Ill. App. 3d 661 (2002), when there is sufficient evidence to support a self-defense instruction, if the defendant requests a second degree murder instruction, it must be given.

The trial court rejected defendant's argument and, citing *People v. Anderson*, 266 Ill. App. 3d 947 (1994), it distinguished *Lockett* and *Edmondson*. The court reasoned that a self-defense instruction was proper as the defendant testified that he observed Ronald with a weapon and, rather than be shot, shot Ronald. With respect to the denied instructions, the trial court noted that *Anderson* "clearly states that a question must exist as to whether that subjective belief is reasonable." The trial court continued, stating that there was not even a scintilla of evidence that there was an unreasonable belief or serious provocation. Further, the trial court noted that there was a lack of testimony of any reckless conduct. The trial court stated that testimony indicated defendant fired his gun three times and three shell casings were found. Therefore, it

-13-

concluded an involuntary manslaughter instruction was improper.

The jury found defendant guilty of first degree murder and aggravated battery with a firearm and that defendant personally discharged the firearm that killed Marquis Reed. Defendant's motion for new trial was denied, and he was sentenced to 55 years' imprisonment for the first degree murder conviction and a consecutive 10-year sentence for the aggravated battery conviction. Defendant now appeals his conviction.

## II. ANALYSIS

We need only consider defendant's argument that the trial court committed reversible error in granting a self-defense instruction but refusing his requested jury instructions for second degree murder, involuntary manslaughter, and unlawful use of a weapon. Defendant notes that the decision to allow a jury instruction is the province of the trial court and, absent an abuse of discretion, refusal or use of a proposed jury instruction will not be cause for reversal. *People v. Garcia*, 165 Ill. 2d 409, 432 (1995). However, defendant maintains that, as he met the evidentiary threshold to support a self-defense instruction, instructions for second degree murder, involuntary manslaughter and unlawful use of a weapon were also supported. Whether a defendant has met the evidentiary minimum for a certain jury instruction is a matter of law, and our review is *de novo*. *People v. Luckett*, 339 Ill. App. 3d 93, 99 (2003).

A person commits first degree murder when he kills an individual without lawful justification by either intending to kill or do great bodily harm to the other person, knowing that action will cause the death or the strong probability of death or great bodily harm to the other. 720 ILCS 5/9-1(a), (b) (West 2006). Second degree murder is committed when the offense of first degree murder is committed, but the offender unreasonably believes the circumstances to be such that the use of deadly force is justified under the principles of self defense. 720 ILCS 5/9-

-14-

2(a)(2) (West 2006). Involuntary manslaughter is committed when the offender unintentionally kills another without lawful justification by recklessly acting in a manner likely to cause death or great bodily harm. 720 ILCS 5/9-3(a) (West 2006). The use of force against another that is intended or likely to cause death or great bodily harm is justified as self-defense when the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another. 720 ILCS 5/7-1 (West 2006).

First, defendant does not provide argument or authority in support of his claim that the trial court erred in denying his request for an instruction for unlawful use of a weapon and did not address this issue in his reply brief. Therefore, pursuant to Rule 341(h)(7), that issue is waived. 210 Ill. 2d R. 341(h)(7). Second, we agree with the State that the trial court did not err in denying defendant's request for an instruction on involuntary manslaughter. As the State argues, Illinois courts have clearly and consistently held that when a defendant points a firearm in the direction of an intended victim and fires the weapon, he has not acted recklessly. *People v. Sipp*, 378 Ill. App. 3d 157, 166 (2007). The testimony at trial, including that of defendant himself, established the fact that defendant purposely pointed his gun at Ronald and pulled the trigger. Accordingly, an instruction for involuntary manslaughter was properly denied.

Defendant argues that where sufficient evidence is present to support an instruction for self-defense, a second degree murder instruction is a mandatory counterpart. *People v. Toney*, 337 Ill. App. 3d 122, 140 (2003); *People v. Lockett*, 82 Ill. 2d 546, 552 (1980). Defendant notes that the trial court concluded that the evidence supported an instruction for self-defense. Defendant maintains that the testimony presented at trial also supported instructions on the lesser charge of second degree murder. Defendant argues that Illinois case law clearly holds that the failure to give instructions for second degree murder improperly removes the question from the

jury of whether a defendant believed in the need to defend himself and whether that belief was reasonable and constitutes reversible error. *Lockett*, 82 Ill. 2d at 552; *People v. Austin*, 133 Ill. 2d 118, 124-25 (1989). Therefore, he concludes, his conviction must be reversed and the matter remanded for a new trial.

The State argues that there must be some evidence in the record to justify a requested instruction and the trial court is vested with the discretion to determine what issues have been raised by the evidence. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). If there is no supporting evidence, a requested instruction should not be given. *Mohr*, 228 Ill. 2d at 65. The State adds that the identification of a lesser-included offense does not automatically give rise to a right to have that instruction given to the jury. *People v. Novak*, 163 Ill. 2d 93, 108 (1994). The State first contends that there was no evidence of recklessness presented to support an involuntary manslaughter instruction.

The State also contends that there was no evidence presented of sufficient provocation, or an unreasonable belief that self-defense was warranted, to merit a second degree murder instruction. The State's argument rests principally on *People v. Anderson*, 266 Ill. App. 3d 947 (1994), cited by the trial court below to support denial of defendant's requested instruction. In *Anderson*, the State presented witnesses who testified that the defendant was the aggressor in shooting two men to death. The defendant testified that the men were his superiors at the apartment complex he worked at. He testified that they had beaten him up and fired him days before they were shot because the defendant would not go along with a scheme to convert the building from federal section 8 housing to condominiums. The defendant further testified that on the day of the shooting, one pointed a gun at the defendant and, following a struggle with the defendant, was shot and killed. He testified that the second man was shot when he walked away

and was in an altercation with men smoking marijuana nearby, which led to the discharge of the gun. *Anderson*, 266 Ill. App. 3d at 950-51.

It is unclear from the opinion what instructions the *Anderson* defendant requested. The court detailed the defendant's argument as: "several jury instructions were denied, improperly given over defendant's objection or not given *sua sponte* by the trial court." *Anderson*, 266 Ill. App. 3d at 950. The court distinguished the matter from *Lockett* on its finding that there was no question of the reasonableness of the defendant's belief. As the trial court did in this case, the *Anderson* court opined that if the jury believed the defendant, it would conclude he acted in self-defense. Conversely, if the defendant was not believed, the jury would find him guilty of murder, and the court concluded that the defendant was not entitled to an instruction regarding an unreasonable belief. *Anderson*, 266 Ill. App. 3d at 951. The court added that even if the defendant was entitled to such an instruction, the error was harmless because the defendant's testimony was contradicted and impeached by direct and circumstantial evidence. *Anderson*, 266 Ill. App. 3d at 952.

Alternatively, the State contends that if we should find the trial court erred in refusing these instructions, any error was harmless. The State argues that where the evidence is so clear and convincing that the jury could not have reasonably found the defendant not guilty, an error in denying an instruction does not merit reversal. *People v. Blan*, 392 Ill. App. 3d 453, 459 (2009); *People v. Moore*, 95 Ill. 2d 404, 409 (1983); *People v. Johnson*, 236 Ill. App. 3d 125, 137-38 (1992). The State concludes that the fact that defendant raised the issue of self-defense does not elevate his claims for lesser crimes, because the evidence must be viewed in light of all the facts and circumstances of the case. *People v. Benedik*, 56 Ill. 2d 306, 309 (1974).

We agree with defendant that the trial court abused its discretion in denying his request

-17-

for an instruction for second degree murder. The State is correct that the evidence is clear and convincing that defendant shot Ronald at close range. It is incorrect that there was no evidence to support instructions for self-defense and second degree murder. The trial court correctly found that there was sufficient evidence to support the self-defense instruction, as only slight evidence is required to support a defendant's requested instruction. See *Luckett*, 339 Ill. App. 3d at 103.

Once that decision was made, the trial court also should have granted the request for the second degree murder instruction under *Lockett* and the well-established line of cases that follows that decision. These cases clearly hold that the failure to submit a tendered instruction on second degree murder in this situation constitutes reversible error. In *Lockett*, the defendant testified that he and fellow passengers in his car engaged in an argument with the victim because his pushcart was blocking their vehicle and the victim was throwing bottles at them. He testified that the victim approached him with a gun and he reached over the front-seat passenger and out the passenger window to shoot the victim. The evidence showed that the victim had an empty whiskey bottle and not a gun. *Lockett*, 82 Ill. 2d at 548-49.

The *Lockett* court agreed with the line of appellate court opinions that held that if *any* evidence supports an instruction on self-defense, it also supports an instruction on the lesser offense of second degree murder. *Lockett*, 82 Ill. 2d at 551-52. The court noted that when given a self-defense instruction, the jury could reach one of three conclusions: (1) that the defendant did not have a subjective belief that the use of force was necessary and he was guilty of first degree murder; (2) that the defendant had a reasonable belief that the use of force was necessary and that he was not guilty; or (3) that, under the circumstances, the defendant had an unreasonable belief that the use of force was necessary and he was guilty of voluntary manslaughter, now second degree murder. *Lockett*, 82 Ill. 2d at 551-52. The court continued on

to define the duty of the court and the duty of the jury in this scenario:

> "It is not the province of the judge to weigh the evidence and decide if defendant's subjective belief was reasonable or unreasonable. The judge's duty is to determine if any evidence is presented that the defendant had a subjective belief. We can conceive of no circumstance when a judge could determine, as a matter of law, that jury could find the defendant had a reasonable subjective belief the killing was justified, but that the jury could not find the defendant's subjective belief was unreasonable. So long as some evidence is presented from which a jury could conclude that defendant had a subjective belief, the jury should determine if the belief existed and, if so, whether that belief was reasonable or unreasonable. Consequently, we hold that when the evidence supports submitting an instruction on justifiable use of force, a tendered [instruction on second degree murder] also should be given." *Lockett*, 82 Ill. 2d at 553.

This ruling in *Lockett* was further explained by the court in *People v. Jeffries*, 164 Ill. 2d 104 (1995). In *Jeffries*, the victim's roommate testified that she heard the victim and the defendant arguing in the alley behind their apartment and she called the victim inside. Later, the victim went across the street to make a call. The roommate testified that she saw the defendant and a man approaching with a baseball bat. She ran outside with a two by four, saw the defendant strike the victim in the leg with the bat, then chase the defendant and eventually bludgeon him to death with the bat. The defendant testified that the victim walked out of the apartment with a gun and chased the defendant. After evading the victim, the defendant returned to the scene with a baseball bat and struck the victim as he left a store, and when the victim again presented his gun, he struck him with the bat to defend himself. *Jeffries*, 164 Ill. 2d at 109-10.

The *Jeffries* court considered the burden of a defendant in asserting self-defense or arguing for the lesser charge of second degree murder under the newly enacted homicide statute. The court rejected the argument that a statutory contradiction existed between the elements for self-defense, and first and second degree murder. The court opined that when the affirmative defense is raised and evidence of both first and second degree murder is presented, the burden is on the State to prove the defendant was not justified in using force. The defendant need only present his best evidence for his defense, and the trier of fact may conclude whether the defendant: (1) was justified and not guilty; (2) had an unreasonable belief in the need to act and guilty of second degree murder; or (3) acted without justification and was guilty of first degree murder. *Jeffries*, 164 Ill. 2d at 129. In coming to this conclusion, the *Jeffries* court noted that, under *Lockett*, when evidence is presented showing a defendant's subjective belief that the use of force was necessary, both self-defense and second degree murder instructions should be given. *Jeffries*, 164 Ill. 2d at 127-28, n.2.

This court has consistently followed this line of cases. See *Luckett*, 339 Ill. App. 3d at 103; *Toney*, 337 Ill. App. 3d at 140; *People v. Edmondson*, 328 Ill. App. 3d 661, 664-65 (2002). The holding in *Anderson* is an aberration from this established line cases. We disagree with *Anderson* that *Lockett* should be limited to where the defendant's subjective belief is actively in question. As explained in *Lockett* and further explored in *Jeffries*, whether the defendant's belief is reasonable is a question for the finder of fact to decide. When the defendant satisfies his burden of presenting evidence of self-defense, the finder of fact may reach one of three conclusions. Contrary to the holding in *Anderson*, our supreme court has consistently held that these three possible conclusions must be decided by the trier of fact.

Assuming *arguendo* that *Anderson* should be followed, we would deny the State's

argument that it is controlling in this case. As defendant asserted at oral argument, the facts of this case are distinguishable from *Anderson*. Unlike *Anderson*, where only the defendant testified to a struggle-against eyewitnesses and evidence to the contrary-here, defendant and Topeka both testified that there was a physical confrontation and that defendant was not the only man with a gun that day. The trial court determined that this was sufficient to instruct the jury on self-defense. It should also have instructed the jury on second degree murder and allowed the jury to determine itself whether there was any subjective belief that the use of force was necessary, and then whether that belief was unreasonable. Accordingly, the failure to follow the above line of cases and tender a second degree murder instruction was an abuse of discretion. *Luckett*, 339 Ill. App. 3d at 106.

Finally, the cases cited by the State in support of its argument that this error was harmless are distinguishable and its argument is unavailing. *Blan*, 392 Ill. App. 3d 453; *Moore*, 95 Ill. 2d 404; *Johnson*, 236 Ill. App. 3d 125.

In *Moore*, the defendant faced charges under the felony murder rule. In that scenario, evidence of intent to kill or the existence of an unreasonable belief that force was necessary irrelevant to the ultimate finding and an instruction on voluntary manslaughter was properly refused. Even if error, the court held that the refusal to tender voluntary manslaughter instructions would be harmless. *Moore*, 95 Ill. 2d at 410-11. In *Johnson*, the defendant confessed to breaking into the victim's home, and then killing the victim when he returned home and attempted to pull a revolver on the defendant when he discovered there was an intruder. The court found that the failure to tender voluntary manslaughter instructions was not an error because Illinois law precludes justifying the use of force during the commission of a forcible felony. As in *Moore*, even if error, the court noted that it was harmless based on the

overwhelming evidence against the defendant. *Johnson*, 236 Ill. App. 3d at 137-38.

The court in *Blan* discussed precedent where the failure to tender a lesser-included offense was harmless in a case involving charges of drug possession and intent to deliver. However, the court departed from that precedent and found that the defendant's inconsistent testimony sufficiently met the requirement of the slight evidence to support instructions on a lesser-included offense. *Blan*, 392 Ill. App. 3d at 459-60. Accordingly, as defendant argues, *Blan* actually supports his argument as the court ultimately held that even inconsistent testimony is sufficient to meet the "slight evidence" requirement and support a self-defense instruction. Further, *Moore* and *Johnson* are clearly distinguishable from this case as both of these cases involved charges-felony murder and murder during the commission of a forcible felony-and fact scenarios where self-defense and second degree murder were not applicable and there could be no error in not tendering that instruction.

The record in this case contains evidence that defendant acted in self-defense or unreasonably thought he was justified to use force in self-defense. The trial court properly tendered self-defense instructions, allowing the jury to fulfill its duty to determine the credibility of defendant and whether his claim had any merit. However, we reject the holding in *Anderson* upon which the trial court relied in refusing defendant's tendered instruction on second degree murder. We find that *Lockett* and the cases that follow it require a finding that the trial court abused its discretion. As the State presented sufficient evidence for a jury to find defendant guilty of first degree murder beyond a reasonable doubt, there is no double jeopardy bar to retrying defendant for that offense. Accordingly, we reverse the judgment against defendant and remand the matter for further proceedings.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court and remand for further proceedings.

Reversed and remanded.

QUINN and COLEMAN, JJ., concur.

No. 1-08-1966

| Please Use Following Form: | |
|---|---|
| | **THE PEOPLE OF THE STATE OF ILLINOIS,** |
| | **Plaintiff-Appellee,** |
| Complete TITLE of Case | **v.** |
| | **MALVIN WASHINGTON,** |
| | **Defendants-Appellant.** |

| Docket No. | |
|---|---|
| | **No. 1-08-1966** |
| | **Appellate Court of Illinois** |
| COURT | **First District, FOURTH Division** |
| Opinion Filed | **March 24, 2010** |
| | **(Give month, day and year)** |

| JUSTICES | **PRESIDING JUSTICE MICHAEL J. MURPHY delivered the opinion of the court:** |
|---|---|
| | **Quinn and Coleman, JJ., concur.** |
| | **dissents.** |

APPEAL from the Circuit Court of Cook County, Illinois.

**Lower Court and Trial Judge(s) in form indicated in the margin:**

**Honorable Diane G. Cannon, Judge Presiding**

**Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.**

For APPELLANTS, John Doe, of Chicago.

**FOR APPELLANT:** Tod M. Urban
820 W. Jackson Blvd., Suite 310
Chicago, IL 60607

Phone: (312) 474-1144

For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)

**FOR APPELLEE:** Anita Alvarez, State's Attorney
James E. Fitzgerald, Mary P. Needham, Mika Soliunas, Asst.
State's Attorneys, Of Counsel
309 Richard J. Daley Center
Chicago, IL 60602 Phone: (312) 603-5496

Also add attorneys for third-party