**FIRST DIVISION**
August 23, 2010

No. 1-08-1383

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| | ) | |
| v. | ) | No. 05 CR 26029 |
| | ) | |
| LAVELLE BILLUPS, | ) | The Honorable |
| | ) | John P. Kirby, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GARCIA delivered the opinion of the court.

The defendant-appellant, Lavelle Billups, testified before a jury that he shot and killed Charles Thompson during a robbery attempt by Thompson after he won the struggle over Thompson's gun. The State presented evidence that the defendant shot and killed Thompson with a gun the defendant had concealed on his person. The jury rejected the claim of self-defense and found the defendant guilty of first degree murder. The defendant contends Judge John P. Kirby abused his discretion by refusing to instruct the jury on second degree murder after instructing on

self-defense.  Alternatively, the defendant contends the State failed to negate his claim of self-defense beyond a reasonable doubt.  We hold Judge Kirby acted within his discretion in not instructing the jury on second degree murder because the defendant's subjective belief was not at issue; no evidence exists upon which the jury could have found the defendant believed circumstances existed that would justify his intentional or knowing killing of Thompson, but that his belief was unreasonable.  In so holding, we follow People v. Anderson, 266 Ill. App. 3d 947, 641 N.E.2d 591 (1994), and distance ourselves from the unfortunate characterization in People v. Washington, 399 Ill. App. 3d 664, 680, 926 N.E.2d 899 (2010), that the Anderson decision is an "aberration."  As in Anderson, this case involves only a claim of perfect self-defense: the evidence permitted only a conclusion of guilty of first degree murder or not guilty by reason of self-defense.  Additionally, we find the State overcame the defendant's claim of justified use of deadly force beyond a reasonable doubt.  Accordingly, we affirm.

BACKGROUND

This case arose from the killing of Charles Thompson in the early morning of October 18, 2005.  Thompson was shot three times and died in an alley running parallel to West 115th Street,

between Yale and Princeton Avenues, in Chicago. He was last seen alive during the late hours of the previous night, in the company of the defendant and the defendant's brother, Dante Billups.

At trial, Dante was the key prosecution witness. According to Dante, on October 17, 2005, he was with his girlfriend, Taiara Koroma, when he received a phone call from the defendant instructing Dante to "pick him up." Dante dropped Taiara off at her apartment and drove her Dodge Caravan to meet the defendant at 65th Street and King Drive. Dante testified he and the defendant were driving on 117th Street near State Street when Thompson, whom he had never seen before, flagged down the van. Thompson and the defendant knew each other. Thompson asked Dante if he had any cocaine. Dante said no, but agreed to take Thompson to a friend that sold cocaine.

According to Dante, as the three men drove toward Dante's friend's house, they stopped at a store to purchase liquor. Shortly thereafter, the police stopped the van at the corner of 119th Street and Calumet Avenue. Officer Verlisher Syas would later testify that she was involved in the traffic stop, which occurred at approximately 10:50 p.m. She and other officers searched all three men and the van. When they discovered an open

beer bottle in the back of the van, they wrote Thompson a ticket for possession of an open alcohol container. Additionally, the officers wrote Dante tickets for an expired license plate and city sticker. Although the officers did not issue the defendant any citations, they gave the defendant a contact card describing the nature of the stop.

Dante testified that he grew nervous after the traffic stop so he decided against taking Thompson to his friend's house. Instead, Dante drove to his mother's house to drop off the liquor he had purchased. Dante and the defendant went inside the house for 15 minutes while Thompson walked the street. Thereafter, all three reentered the van and Dante agreed to drive Thompson to 95th Street. As Dante drove, Thompson and the defendant said they had to urinate. Dante drove the van into the alley parallel to 115th Street, between Yale and Princeton Avenues. The defendant and Thompson walked behind the van, where Dante could not see or hear them.

Approximately 20 seconds later, Dante heard gunshots and "thought somebody was shooting at us." Dante's immediate reaction was to drive away out of the alley, but he stopped at the corner when he realized his brother was still in the alley.

4

When the defendant reached the stopped van, he entered through the rear sliding door, and "just said 'drive.' " Dante asked the defendant what happened but got no answer. Dante drove the van to Taiara's apartment. Once inside, Dante again asked the defendant what happened. According to Dante, the defendant answered, "he think he shot him." Dante asked the defendant where he obtained a gun; the defendant claimed "he had it the whole time."

Officer Syas testified that shortly after midnight on the morning of October 18, 2005, she responded to a call of a man shot in an alley. The decedent was killed by multiple gunshots and was discovered in the alley lying facedown with his pants halfway down and his boxers still up. The officers on the scene recovered four cartridge cases, two near the decedent and two underneath the decedent's body. Officer Syas identified the decedent as Thompson, the same man involved in the traffic stop a little more than an hour earlier. Officer Syas informed the other officers at the scene that Thompson had been riding in a Dodge Caravan with the defendant and Dante. Police officers proceeded to Taiara's apartment, where the vehicle was registered. There, they found Dante and the defendant. The

officers recovered a handgun from a pair of the defendant's pants and arrested both men.  Officers also searched the Dodge Caravan, but recovered no evidence; no blood was present in the van and it had no bullet holes.

Dr. Nancy Jones, the Cook County medical examiner, testified she recovered three bullets from Thompson's body during the autopsy.  The first two entered the right upper chest and the front of the left hip, but did not appear to have been fired from "close range," within 18 to 24 inches of the body.  The third bullet entered the back of Thompson's head, and based on a muzzle-impression around the wound and gunpowder inside the wound, Dr. Jones determined that the barrel of the gun was touching Thompson's skull when that bullet was fired.  Dr. Jones added that because the head wound was "immediately incapacitating" while the other two wounds were not, the shot to Thompson's head was fired last.

The defendant offered only his own testimony in his defense. According to the defendant, on October 17, 2005, at approximately 7 p.m., Dante drove the Dodge Caravan to the corner of 79th Street and Ingleside to pick up the defendant.  At 79th Street and King Drive, Thompson, whom the defendant had known for a few

6

months, flagged them down and asked for a ride to 116th Street and Wentworth. Dante agreed. Thompson entered the van and the three men drove to a liquor store. Dante then drove to his and Dante's mother's house so Thompson could buy some crack cocaine that Dante stored there. Dante entered the house while the defendant remained near the van and Thompson walked about.

Fifteen minutes later, Dante emerged from the house. All three men got in the van, and Dante drove into an alley about a block away. Dante stopped the van in the alley and handed the drugs to Thompson, who was seated in the front passenger seat. The defendant, who was seated directly behind Thompson, opened the sliding door, anticipating that Thompson would leave the van after purchasing the drugs and the defendant would then move to the front passenger seat.

According to the defendant, Thompson suddenly pointed a gun at Dante and demanded the drugs and his money. On direct examination, the defendant testified that Thompson got out of the van and reentered the van through the open sliding door. This forced the defendant to move to the seat directly behind the driver's seat. With the gun in his right hand, Thompson patted down the defendant with his left hand, removing $2 from him. At

7

this point, the defendant began to wrestle with Thompson, during which he managed to take the gun from Thompson. Thompson then grabbed the hood of the defendant's sweatshirt, pulling it over his head while forcing the defendant to his knees inside the van with the defendant's face toward the floor. The defendant testified he fired the gun in the direction of Thompson without looking, although he was not sure how many times. The defendant felt Thompson loosen his grip on the hood, which allowed the defendant to look up and see Thompson fall to one knee just outside the van. The defendant testified he then shot Thompson once more on the top of his head. Dante then exited the driver's seat and walked around the van to pat down Thompson for his drugs and money. Dante got back into the driver's seat, the defendant got into the passenger seat, and the two drove to Taiara's apartment. Although the defendant and Dante discussed turning themselves in, they did not because they knew the police would locate them based on the recent traffic stop.

On cross-examination, the defendant admitted that following his arrest, during his first interview at the police station, he denied knowing anyone by the name of "Charlie." At trial, he explained his denial: "I know Charles. I don't know Charlie."

8

He also claimed to the interviewing officers that he and Dante were alone in the van during the traffic stop. When asked during the interview about the gun, the defendant answered, "What gun?" The defendant acknowledged that the first time he claimed that a shooting occurred during a drug deal between Dante and Thompson was during his testimony at trial. At trial was also the first time he said Dante got out of the van while it was parked in the alley. The defendant admitted he never told the interviewing officers that Thompson had pulled a gun on him. On cross-examination, the defendant asserted that Thompson never reentered the van after vacating the front passenger seat. Instead, Thompson only leaned into the van from outside the sliding door to pat down the defendant and take his $2. During his entire testimony, the defendant maintained that he did not shoot Thompson in the back of the head.

After the State's rebuttal case of three witnesses, both sides rested. Judge Kirby then conducted a conference on jury instructions. The defendant requested instructions on self-defense and second degree murder. The State agreed to a self-defense instruction, but objected to instructing the jury on second degree murder. The defendant argued that under People v.

Lockett, 82 Ill. 2d 546, 413 N.E.2d 378 (1980), the jury must be given a second degree murder instruction whenever it is instructed on self-defense.  The State argued that the trial evidence did not give rise to an unreasonable belief in the use of deadly force and thus no second degree murder instruction was required pursuant to Anderson.  Judge Kirby agreed:

> "[T]he proposition of law that was initiated by the Supreme Court in 1980 in Lockett was addressed here in Anderson.  I will apply the ruling of Anderson based on the facts that was [sic] presented, based on the defendant's testimony, based on the doctor's testimony, and based on Dante's testimony.  The request for [a second-degree-murder] instruction will be denied."

The jury found the defendant guilty of first degree murder. Judge Kirby sentenced the defendant to life imprisonment.  The defendant timely appeals.

## ANALYSIS

We first address the underlying issue of whether the holding in People v. Anderson, 266 Ill. App. 3d 947, 951, 641 N.E.2d 591

(1994), that the rule in People v. Lockett, 82 Ill. 2d 546, 413 N.E.2d 378 (1980), does not apply when the "subjective belief" of the defendant is not at issue before the jury precluding an instruction on second degree murder even though the jury is instructed on self-defense, is an accurate statement of law.  In reversing, the Washington court adopted the defendant's argument "that where sufficient evidence is present to support an instruction for self-defense, a second degree murder instruction is a mandatory counterpart."  (Emphasis added.)  Washington, 399 Ill. App. 3d at 676.

Subjective Belief

In Lockett, the supreme court noted the shared element of "subjective belief" in the affirmative defense of self-defense and in the offense of voluntary manslaughter, now known as second degree murder.  See People v. Jeffries, 164 Ill. 2d 104, 111, 646 N.E.2d 587 (1995) (effective July 1, 1987, the legislature "abolished the offense of voluntary manslaughter, and substituted for it the offense of second degree murder"); 720 ILCS 5/9-2(b) (West 2006).  The Lockett court illustrated the role of subjective belief in self-defense, voluntary manslaughter, and murder in its discussion of the three possible outcomes when a

1-08-1383

jury is called to assess a defendant's subjective belief.

"First, it could decide that the defendant
did not have a subjective belief that use of
force was necessary.  In that case, the
verdict should be murder.  Second, it could
determine that the defendant had the
subjective belief that use of force was
necessary and that subjective belief was
reasonable.  In that event, the defendant's
use of force was justified and the verdict
should be not guilty.  Third, a jury could
conclude that the defendant subjectively
believed that use of force was necessary, but
that this subjective belief was unreasonable
under the circumstances.  This third
alternative is the precise situation in which
a verdict of voluntary manslaughter should be
reasoned under section 9-2(b)."  (Emphasis
added.)  Lockett, 82 Ill. 2d at 551-52.

While self-defense includes the element of subjective belief
that "a danger existed that required the use of the force

12

1-08-1383

applied," the essential showing to successfully claim self-defense is that "the beliefs of the person threatened were objectively reasonable." (Emphasis added.) People v. Lee, 213 Ill. 2d 218, 225, 821 N.E.2d 307 (2004). In other words, for a verdict of not guilty by reason of self-defense, the element that the defendant "subjectively believed a danger existed" is equivalent to the element that "his beliefs were objectively reasonable." Jeffries, 164 Ill. 2d at 128. Stated differently, in the case of a successful self-defense claim under the second alternative discussed in Lockett where "the verdict should be not guilty," the beliefs subjectively held by the defendant and the defendant's beliefs the jury should conclude are objectively reasonable in finding self-defense must be one and the same. Lockett, 82 Ill. 2d at 551 ("defendant had the subjective belief that use of force was necessary and that subjective belief was reasonable" (emphasis added)).

It is this distinction between a reasonable, subjective belief to support a claim of self-defense and the unreasonable, subjective belief involved in the offense of voluntary manslaughter that the Lockett court acknowledged:

"The State correctly draws a distinction

13

between a reasonable, mistaken belief under section 7-1 (<u>e.g.,</u> a reasonable belief that the victim was coming at him with a gun when the victim, in fact, had no gun) and an unreasonable belief under section 9-2(b) (<u>e.g.,</u> a belief that the victim was coming at him with a gun and that belief was unreasonable). <u>Lockett</u>, 82 Ill. 2d at 550.

Based on a subjective belief that is unreasonable, the voluntary manslaughter form at issue in <u>Lockett</u> (now second degree murder) is often "referred to as imperfect self-defense." <u>Jeffries</u>, 164 Ill. 2d at 113. The "imperfect" nature of the self-defense claim for second degree murder is the unreasonableness of the defendant's subjective belief that force was justified. <u>Jeffries</u>, 164 Ill. 2d at 113 ("the defendant believed he was acting in self-defense, but that belief is objectively unreasonable").

The <u>Lockett</u> court made clear that a jury must be instructed on second degree murder when the evidence places at issue before the jury the <u>subjective belief</u> of the defendant. "Therefore, a self-defense and a voluntary manslaughter instruction should be

14

given when any evidence is presented showing the defendant's subjective belief that use of force was necessary." (Emphasis added.) Lockett, 82 Ill. 2d at 552.

In Anderson, Justice J. Gordon, writing for the fifth division, determined that the rule in Lockett did not apply: "We believe the holding in Lockett is inapplicable to the facts in the instant case. In Lockett, the defendant's subjective belief clearly was in question, and the jury had to decide whether the defendant could reasonably believe the concealed object the victim picked up before the defendant shot him was a gun, when it was actually an empty whiskey bottle." Anderson, 266 Ill. App. 3d at 951.

It is no coincidence that the salient facts in this case mirror the salient facts in Anderson. In his testimony, defendant Anderson put the gun in the hands of the decedent. "[T]he defendant's testimony was that Sutton [the victim] pointed a gun at the defendant, that a struggle ensued, and that the gun went off, fatally injuring Sutton." Anderson, 266 Ill. App. 3d at 951. The prosecution witnesses testified, however, that the defendant had the gun all along, walked over to the decedent and shot him. Anderson, 266 Ill. App. 3d at 951. Based on the

15

diametrically opposed versions of the salient facts, Justice J. Gordon determined that "the defendant's subjective belief was not in question." Anderson, 266 Ill. App. 3d at 951. "If the jury disbelieved the defendant's testimony and believed the testimony of the other witnesses, then there was no physical altercation between Sutton and the defendant and, instead, the defendant was the aggressor; had possession of the gun; walked over to Sutton; and shot him." Anderson, 266 Ill. App. 3d at 951.

In the case before us, the defendant claimed that Thompson had the gun, that Thompson attempted to rob the defendant and Dante, and that the defendant acted in self-defense in killing Thompson. That is, the shooting occurred while Thompson was engaged in an armed robbery, which justified the defendant's conduct "to prevent *** the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2006). The prosecution, on the other hand, presented evidence that the defendant shot and killed Thompson within 20 seconds after the two exited the van in an alley to urinate. While Dante did not see the actual shooting, he testified that the defendant admitted to having the gun used in the shooting "the whole time," an apparent reference to the failure of the Chicago police to discover the gun when they

16

searched the defendant following the traffic stop.

The defense proposition, before the jury here and before the Anderson jury, might best be described as a claim of perfect self-defense. In the instant case, it is a claim of perfect self-defense because if the jury believes the circumstances existed as testified to by the defendant--that Thompson used his own gun in an attempt to rob the defendant and Dante and, that in the course of defending himself against a forcible felony, the defendant killed Thompson--the verdict must be not guilty by reason of self-defense. A similar claim of perfect self-defense was presented in Anderson. "If the jury believed [the factual scenario alleged by the defendant occurred], and that Sutton instigated the altercation and threatened the defendant by pointing a gun at him, then the jury could conclude that the defendant could reasonably believe that the use of deadly force was necessary to prevent imminent death or great bodily harm to himself [citation]." Anderson, 266 Ill. App. 3d at 951.

The claim is one of perfect self-defense because, in effect, each defendant implies that had the incident been videotaped, the videotape would reveal the circumstances to be as each testified. The same objective facts would be seen on the videotape. There

17

1-08-1383

is no overlap between the prosecution's version of the salient facts and the defendant's. Each claim of self-defense was an all-or-nothing proposition, prevail or be found guilty of first degree murder.

By the same token, there was no issue regarding the subjective belief of each defendant before the jury because each defendant's claim was that the "facts" were such that the conduct of each was objectively reasonable. In other words, the choice for each jury was to find either objectively reasonable beliefs on the part of each defendant or that each defendant "did not have a subjective belief that use of force was necessary" and was therefore guilty of first degree murder. Lockett, 82 Ill. 2d at 551. When a jury must choose between two irreconcilable versions of the salient facts, such as in this case and in Anderson, the third Lockett alternative that "a jury could conclude that the defendant subjectively believed that the use of force was necessary, but that this subjective belief was unreasonable under the circumstances," is not possible. (Emphasis added.) Lockett, 82 Ill. 2d at 552. Stated in stark terms, the subjective belief of each defendant was not at issue because, in order to reject the claim of self-defense, the jury had to determine that each

18

defendant's testimony placing the gun in the hands of the decedent was a fabrication.

When a claim of perfect self-defense is made, the dispositive question is not whether the use of force by the defendant is reasonable or unreasonable under the circumstances but, rather, which set of opposing <u>circumstances</u> presented by the parties existed at the time of the incident based upon all of the evidence: the one urged by the defendant that the decedent was the aggressor or true criminal or the one urged by the prosecution that the defendant killed the decedent in a senseless act. The circumstances existed as the defendant testified or they did not. The jury could conclude only one of two things: either the circumstances were as the defendant testified, which means his claim of self-defense is perfect, or the circumstances were as the prosecution witnesses testified, which means the defendant is guilty of first degree murder.

Though a case of perfect self-defense based on diametrically opposed salient facts is uncommon, we understand the supreme court to have acknowledged that such a case might arise. "The State does not contend that the facts of this case would permit only a conclusion of murder or not guilty by reason of self-

19

1-08-1383

defense." People v. Joyner, 50 Ill. 2d 302, 306, 278 N.E.2d 756 (1972). The trial judge below ruled that the diametrically opposed salient facts presented by the prosecution and the defendant's self-defense claim, which boiled down to who brought the gun to the confrontation, permitted "only a conclusion of murder or not guilty by reason of self-defense." Joyner, 52 Ill. 2d at 306. During the trial, the prosecution argued as much to the jury: "As a matter of fact, ladies and gentlemen, in order to find him not guilty, you have to believe [the defendant's] story."

Based on the decision in Anderson, the trial judge properly ruled that the polar-opposite facts allowed for only one of two verdicts: if the defendant were believed, he must be found not guilty by reason of self-defense; if the prosecution witnesses were believed, the defendant was guilty of first degree murder. As in Anderson, the defendant's subjective belief was not at issue. In a case where a claim of perfect self-defense is made, there is no room in the evidence for a finding of second degree murder by the jury.

## Exercise of Discretion

The Illinois Supreme Court in Lockett also reminded us that

20

it is the record evidence that should drive the decision to instruct the jury on second degree murder.

> "It is the settled rule in murder cases that if there is <u>evidence in the record</u> which, if believed by a jury, would reduce the crime to manslaughter, an instruction defining manslaughter should be given. [Citations.]

> It is equally well settled, however, that such an instruction should not be given if the <u>evidence</u> clearly demonstrates that the crime was murder and there is no evidence upon which a jury might find the defendant guilty of manslaughter."  (Emphasis added.) <u>Lockett</u>, 82 Ill. 2d at 550-51.

We do not read <u>Lockett</u> to have changed well-settled law that the exercise of sound discretion on the instructions to tender to a jury turns on the trial judge's assessment of the evidence in the record.  The "clear guidelines" from the Illinois Supreme Court direct a trial court to determine whether "some evidence" exists that, if believed by the jury, would reduce a crime from first degree murder to second degree murder.  <u>People v. Austin</u>,

1-08-1383

133 Ill. 2d 118, 124, 549 N.E.2d 331 (1989). If some evidence exists in the record, "a defendant's request for a [second degree murder] instruction must be granted." (Emphasis added.) Austin, 133 Ill. 2d at 124-25. To be clear, a trial court abuses its discretion when it makes an error of law by not instructing on second degree murder. Washington, 399 Ill. App. 3d at 680. See also Koon v. United States, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 414, 116 S. Ct. 2035, 2047 (1996) (where the Supreme Court explained that "[l]ittle turns *** on whether we label review of this particular question abuse of discretion or de novo, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction").

Lockett did not establish, however, that a second degree murder instruction is, by rote application, a "mandatory counterpart" to a self-defense instruction.[1] Washington, 399

---

[1] The need to assess the evidence separately in deciding whether to instruct on second degree murder when instructing on self-defense has been previously noted. "I do not believe that a finding that there are facts sufficient to require the giving of an instruction on justifiable use of force, ipso facto, requires

22

1-08-1383

Ill. App. 3d at 676. We agree with <u>Anderson</u>. "We do not believe that <u>Lockett</u> is so encompassing." <u>Anderson</u>, 266 Ill. App. 3d at 950.

In the case at bar, the jury instruction conference was held after both sides had rested, which meant the trial judge had a full understanding of the opposing theories put forth by the parties. As demonstrated above, the parties presented diametrically opposed explanations for the origin of the gun used in the shooting, which removed the defendant's subjective belief as an issue before the jury.

We agree with the <u>Anderson</u> court's determination that the <u>Lockett</u> rule does not apply to cases where the defendant's subjective belief is not at issue. <u>Anderson</u>, 266 Ill. App. 3d at

---

the giving of an instruction on voluntary manslaughter--the so-called third alternative. *** I think there are two questions of law involved, that is, are there sufficient facts to support one (self-defense) and are there, again, sufficient facts, to support the other (manslaughter)?" <u>People v. Johnson</u>, 1 Ill. App. 3d 433, 435-36, 274 N.E.2d 168 (1971) (Smith, P.J., dissenting).

23

1-08-1383

951. It follows that in such cases, the trial court does not abuse its discretion in failing to instruct on second degree murder. It remains within the sound discretion of the trial judge to assess the evidence and determine whether a second degree murder instruction is warranted. Austin, 133 Ill. 2d at 124; Anderson, 266 Ill. App. 3d at 950-51.

To support his contention that the trial judge abused his discretion in failing to instruct on second degree murder, the defendant offers a single assertion in his main brief: "a jury could have concluded that the third shot, which ultimately killed Thompson, was unreasonable given the effect of the first two." The defendant cites no authority for his implied contention that the jury is free to parse one of three shots as being unreasonable. Nor does the defendant argue that each of the three shots constituted " 'separate and distinct acts' *** capable of independently sustaining a complete criminal conviction" as the supreme court discussed in People v. Crespo, 203 Ill. 2d 335, 340, 788 N.E.2d 1117 (2001). Accordingly, the defendant's argument based on the claimed unreasonableness of the third shot is forfeited. See 210 Ill. 2d R. 341(h)(7).

On its merits, the defendant's assertion is unpersuasive. A

24

similar contention by the State to parse the acts of a defendant into separate offenses was rejected by the Illinois Supreme Court in Crespo. Unless the charging instrument evinces otherwise, the State is barred from treating "the conduct of defendant as multiple acts in order [to obtain] *** multiple convictions." Crespo, 203 Ill. 2d at 345. We are unpersuaded that a different rule should apply when it is the defendant that seeks to apportion his beliefs among the various shots he fired at Thompson.

The real question before us is whether "some evidence" exists in the record to support a second degree murder instruction. Austin, 133 Ill. 2d at 124-25. According to the defendant, all three wounding shots were fired when he gained the upper hand during the armed robbery attempt by Thompson. In order to find the defendant guilty of second degree murder, the jury would have to first find the State proved each proposition for first degree murder beyond a reasonable doubt, including "that the defendant was not justified in using the force which he used." Illinois Pattern Jury Instructions (IPI), Criminal, No. 7.06 (2006). The burden would then fall on the defendant to prove "by a preponderance of the evidence that [the] mitigating

25

factor [of unreasonable belief] is present" to reduce the offense to second degree murder.  IPI, Criminal, No. 7.06 (2006).  We note, the State did not charge the defendant with first degree murder based solely on the third and fatal shot.  The defendant fails to inform us of any facts in the record to support his claim that the jury could find he was justified in shooting Thompson twice, but he had the unreasonable subjective belief that shooting Thompson for a third time was necessary.  See People v. Sample, 326 Ill. App. 3d 914, 928, 761 N.E.2d 1199 (2001) ("To parse the crimes out into bounded acts would contradict the reality that these crimes were intertwined both temporally and functionally").  It is telling that no "state of mind" testimony to support such a claim was ever elicited from the defendant.  Cf. People v. Keefe, 209 Ill. App. 3d 744, 751, 567 N.E.2d 1052 (1991) (when the defendant's state of mind is material to the issue of self-defense, he should be allowed to testify "that he feared for his life or that he was in danger of great bodily harm").  We find no basis to support the defendant's claim that the jury should have been instructed on second degree murder based on the third shot.

That rules apply equally to the prosecution and defense

26

means that the exception to the Lockett rule first announced in Anderson, that we apply here, may yet benefit a defendant under different circumstances. When the prosecution and defense present diametrically opposed circumstances of a shooting, with credible evidence presented on behalf of the defendant, the parties may well change sides on this issue. A case may arise where the State requests the jury be instructed on second degree murder, with the defendant objecting to the tender of such an instruction. Such a defendant may object to a second degree murder instruction because he or she wants the jury to choose between the State's witnesses and the credible defense witnesses, thereby avoiding the possibility of a compromise verdict. See People v. Dixon, 58 Ill. App. 3d 557, 560, 374 N.E.2d 900 (1978) (defendant claimed error when the jury was instructed on voluntary manslaughter over his objection because "giving such instructions relieved the jurors of the need to make this decision by presenting them with an easier compromise verdict"). Under the holding in Anderson and the instant case, such a maneuver by the prosecution when faced with a claim of perfect self-defense should be rejected.

Based on the evidence presented, the trial judge here did

27

not abuse his discretion in refusing to instruct the jury on second degree murder. The jury could conclude only one of two things: either the circumstances were as the defendant testified, which means the defendant was not guilty by reason of self-defense, or the circumstances were as the prosecution witnesses testified, which means the defendant was guilty of first degree murder. Anderson, 266 Ill. App. 3d at 951.

## Self-Defense Claim

Having set out the diametrically opposed evidence presented by the defendant and the prosecution in addressing the earlier issues, we say little to reject the defendant's final contention that the prosecution failed to overcome beyond a reasonable doubt his claim of self-defense. It was for the jury to decide which of the two opposing sets of circumstances it found credible. See People v. Feyrer, 269 Ill. App. 3d 734, 743, 646 N.E.2d 1244 (1994) ("the jury was not required to accept defendant's testimony and version of events as true").

## CONCLUSION

The evidence below presented irreconcilable accounts of the shooting death of Charles Thompson. Based on the State's evidence, the defendant used his own gun to shoot and kill

28

Thompson. In the defendant's account, it was Thompson who, while armed with a gun, attempted to rob the defendant and his brother. After wrestling the gun away from Thompson, the defendant shot and killed Thompson. Although the facts before the jury warranted a self-defense instruction based on the defendant's version of the events, there is no evidence to support a middle ground between guilty of murder and not guilty by reason of self-defense. Judge Kirby did not err in not instructing on second degree murder because no evidence existed that could reduce first degree murder to second degree. Because no rational trier of fact could find the defendant guilty of second degree murder, we find no basis to grant the defendant a new trial.

Affirmed.

HALL, P.J., and PATTI, J., concur.

## REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

**PEOPLE OF THE STATE OF ILLINOIS**
    **Plaintiff-Appellee,**

**v.**

**LAVELLE BILLUPS,**
    **Defendant-Appellant.**

### No. 1-08-1383

**Appellate Court of Illinois**
**First District, First Division**

**Filed: August 23, 2010**

**JUSTICE GARCIA delivered the opinion of the court.**

**HALL, P.J., and PATTI, J., concur.**

**Appeal from the Circuit Court of Cook County**
**Honorable John Kirby, Judge Presiding**

| | |
|---|---|
| **For PLAINTIFF-APPELLEE** | **Anita Alvarez**<br>**State's Attorney, County of Cook** |
| | **Alan J. Spellberg**<br>**Douglas P. Harvath**<br>**Miles J. Keleher**<br>**Assistant State's Attorneys, Of Counsel**<br>**Richard J. Daley Center, Room 309**<br>**Chicago, IL 60602** |
| **For DEFENDANT-APPELLANT** | **Paul E. Wojciciki**<br>**Jason A. Higginbotham**<br>**Segal McCambridge Singer & Mahoney, Ltd.** |

**Willis Tower 5500**
**233 South Wacker Drive**
**Chicago, Illinois 60606**